AO 241
(Rev. 01/15)

Page 2

## PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF
## HABEAS CORPUS BY A PERSON IN STATE CUSTODY

| United States District Court | District: MARyland | |
|---|---|---|
| Name (under which you were convicted): <br> Jamaal Kenneth Abeokuto | | Docket or Case No.: <br> 12K03000310 |
| Place of Confinement : <br> Western Correctional institution | Prisoner No.: <br> 323-969 ; 1780656 | |
| Petitioner (include the name under which you were convicted) <br><br> Jamaal Kenneth Abeokuto | Respondent (authorized person having custody of petitioner) <br> v. <br> MAtthew J. Fader | |
| The Attorney General of the State of: | | |

FILED ____ ENTERED
____ LOGGED ____ RECEIVED

**PETITION**

JUN – 9 2021

AT BALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

1.  (a) Name and location of court that entered the judgment of conviction you are challenging:

Circuit Court For Baltimore County

   (b) Criminal docket or case number (if you know):   03-K-03- 002127

2.  (a) Date of the judgment of conviction (if you know):   8-27-04

   (b) Date of sentencing:   November 16, 2004

3.  Length of sentence:   Life + 43 yrs

4.  In this case, were you convicted on more than one count or of more than one crime?   ☑ Yes   ☐ No

5.  Identify all crimes of which you were convicted and sentenced in this case:   murder - first degree,
Assault - first degree, Ex toetion, Kidnapping, dangerous weapons,
Child Kidnapping.




6.  (a) What was your plea? (Check one)

   ☑ (1)   Not guilty        ☐ (3)   Nolo contendere (no contest)

   ☐ (2)   Guilty            ☐ (4)   Insanity plea

(b) If you entered a guilty plea to one count or charge and a not guilty plea to another count or charge, what did you plead guilty to and what did you plead not guilty to?

_____

_____

_____

_____

_____

_____

(c) If you went to trial, what kind of trial did you have? (Check one)

☐ Jury      ☑ Judge only

7.  Did you testify at a pretrial hearing, trial, or a post-trial hearing?

☐ Yes      ☑ No

8.  Did you appeal from the judgment of conviction?

☑ Yes      ☐ No

9.  If you did appeal, answer the following:

(a) Name of court:   _Court of Appeals of Maryland_

(b) Docket or case number (if you know):   _IR 35120_

(c) Result:   _New Sentencing hearing_

(d) Date of result (if you know):   _____

(e) Citation to the case (if you know):   _____

(f) Grounds raised:

_See Attached
Court of Appeals of
Maryland -
Table of Contents
1-3 pages_

(g) Did you seek further review by a higher state court?      ☐ Yes      ☑ No

If yes, answer the following:

(1) Name of court:   _____

(2) Docket or case number (if you know):   _____

(3) Result:   _____

(4) Date of result (if you know):   _____

# INDEX

---

## TABLE OF CONTENTS

Page

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

QUESTIONS PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23

I.    THE TRIAL COURT ERRED IN DETERMINING THAT MR. ABEOKUTO'S WAIVER OF HIS CONSTITUTIONAL RIGHT TO A TRIAL BY JURY AT THE GUILT OR INNOCENCE PHASE WAS KNOWING AND VOLUNTARY. . . . . . . . . . . . . . . . . .   23

II.   THE TRIAL COURT ERRED IN ACCEPTING MR. ABEOKUTO'S WAIVER OF JURY SENTENCING. . . . . . . . .   35

III.  THE TRIAL COURT ERRED IN ADMITTING EVIDENCE OF MR. ABEOKUTO'S POST-ARREST, POST-*MIRANDA* WARNING SILENCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   45

IV.   THE TRIAL COURT ERRED IN DENYING MR. ABEOKUTO'S REQUESTS FOR CONTINUANCE TO PERMIT NEW COUNSEL TO PREPARE FOR TRIAL AND TO PREPARE FOR THE SENTENCING HEARING. . . . . . . . . . . . . . . . . . . . . . . . . . . .   51

V.    THE TRIAL COURT ERRED WHEN IT DENIED MR. ABEOKUTO'S MOTION TO SUPPRESS HIS STATEMENT AT THE HOMICIDE UNIT BECAUSE MR. ABEOKUTO'S FIFTH AMENDMENT RIGHT AGAINST COMPELLED SELF-INCRIMINATION WAS VIOLATED WHEN DETECTIVES INTERROGATED HIM WITHOUT FIRST WARNING HIM OF

HIS *MIRANDA* RIGHTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

VI. THE TRIAL COURT ERRED WHEN IT DENIED MR. ABEOKUTO'S MOTION TO SUPPRESS THE CLOTHES THAT THE DETECTIVES REMOVED FROM HIM DURING HIS DETENTION AT THE HOMICIDE UNIT. . . . . . . . . . . . . . . . . . 69

VII. THE SUPPRESSION COURT ERRED WHEN IT DETERMINED THAT THE WARRANT TO SEARCH MR. ABEOKUTO'S CAR WAS SUPPORTED BY PROBABLE CAUSE. . . . . . . . . . . . . . . 74

VIII. THE TRIAL COURT ERRED IN ADMITTING DR. FEY'S TESTIMONY AT THE SENTENCING HEARING. . . . . . . . . . . 79

IX. MR. ABEOKUTO'S DEATH SENTENCE MUST BE REVERSED AS A RESULT OF IMPROPER PROSECUTORIAL CLOSING ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

X. THE TRIAL COURT ERRED IN ADMITTING TESTIMONY BY THE VICTIM'S FAMILY MEMBERS CONCERNING THE APPROPRIATE PENALTY FOR THE MURDER. . . . . . . . . . . . 93

XI. THE TRIAL COURT ERRED IN IMPOSING SEPARATE SENTENCES FOR KIDNAPPING AND CHILD KIDNAPPING .98

XII. THE TRIAL COURT ERRED IN FINDING AS SEPARATE AGGRAVATING CIRCUMSTANCES THAT THE VICTIM WAS TAKEN IN THE COURSE OF AN ABDUCTION OR KIDNAPPING AND THAT THE VICTIM WAS A CHILD ABDUCTED IN VIOLATION OF § 3-503(A)(1) OF THE CRIMINAL LAW ARTICLE. . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

XIII. THE SENTENCING COURT ERRED IN ADMITTING EVIDENCE OF A HANDGUN RECOVERED FROM MR. ABEOKUTO'S VEHICLE. . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

XIV. THE CUMULATIVE EFFECT OF THE ERRORS SET FORTH HEREIN DEPRIVED MR. ABEOKUTO OF A FAIR TRIAL AND/OR A FAIR SENTENCING HEARING. . . . . . . . . . . . . . 114

XV. THE TRIAL COURT ILLEGALLY INCREASED APPELLANT'S SENTENCE FOR EXTORTION. . . . . . . . . . . . . . . . . . . . . . . . 115

XVI. THE FAILURE OF THE INDICTMENT TO ALLEGE PRINCIPALSHIP AND AGGRAVATING CIRCUMSTANCES SHOULD HAVE PRECLUDED THE IMPOSITION OF A SENTENCE OF DEATH. ............................. 116

XVII. THE MARYLAND DEATH PENALTY STATUTE IS UNCONSTITUTIONAL. ............................. 134

CONCLUSION ................................................ 134

PERTINENT AUTHORITY ...................................... 136

## TABLE OF CITATIONS

### Cases

*Anderson v. State*, 92 Fla. 477, 110 So. 250 (1926) ...................... 54

*Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348 147 L.Ed.2d 435 (2000) ........................... 121-123

*Ayre v. State*, 291 Md. 155, 433 A.2d 1150 (1981) ................... 124, 129

*Baker v. State*, 367 Md. 648, 790 A.2d 629 (2002) ................... 40, 126

*Banks v. State*, 84 Md. App. 582, 581 A.2d 439 (1990) ................... 113

*Bartholomey v. State*, 260 Md. 504, 273 A.2d 164 (1971) ................... 96

*Battle v. State*, 287 Md. 675, 414 A.2d 1266 (1980) ...................... 44

*Beard v. State*, 216 Md. 302, 140 A. 2d 672 (1958) ...................... 129

*Birchead v. State*, 317 Md. 691, 566 A.2d 488 (1989) ...................... 75

*Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932) ......................................... 98

*Bohnert v. State*, 312 Md. 266, 539 A.2d 657 (1988) ...................... 81

*Bond v. State*, 142 Md. App. 219, 788 A.2d 705 (2002) ................... 67

(5) Citation to the case (if you know): _____

(6) Grounds raised: _____

_____

_____

_____

(h) Did you file a petition for certiorari in the United States Supreme Court?   ☐ Yes   ☑ No

If yes, answer the following:

(1) Docket or case number (if you know): _____

(2) Result: _____

(3) Date of result (if you know): _____

(4) Citation to the case (if you know): _____

10.  Other than the direct appeals listed above, have you previously filed any other petitions, applications, or motions concerning this judgment of conviction in any state court?   ☑ Yes   ☐ No

11.  If your answer to Question 10 was "Yes," give the following information:

(a)  (1) Name of court: *Circuit Court for Baltimore County*

(2) Docket or case number (if you know): *03-K-03-002127*

(3) Date of filing (if you know): *January 16, 2013*

(4) Nature of the proceeding: *Post Conviction Hearing*

(5) Grounds raised: _____

*See attached - copy
of post conviction
petition allegations
18 pages*

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

☐ Yes   ☑ No

(7) Result: *Petition denied*

(8) Date of result (if you know): *April 9th, 2020*

②

## Statement of Case

The Trial took place in Boltimore County on August 23, 2004. The petitioner was arrested and charged with; First Degree Murder, Extortion, Kidnapping, Dangerous weapon & Child Kidnapping. He was Sentenced to life without parole plus 43 years.

- Allegations of Error and Concise Statement of Facts -
<u>Ineffective assistance of counsel</u>

① Mr. Warren A. Brown acts and Omissions were outside the wide range of professional Competent assistance. He chose to pursue no other defense besides beating the case on a technicality on the indictment.

② Mr. Brown failed to purse my defense of not Criminally responsible despite my request and prepared research

③ Mr. Brown was ineffective because he represented me in a Capital case without a Second chair, while the State had two chairs.

④ Mr. Brown put the States case to no adversarial testing. He hardly cross-examined any of the States witnesses at all and he had no defense.

③

(5) MR. Brown prejudice my defense by turning over all of my expert work product for NCR to the State without my permission or my Knowledge. Work product He failed to Use despite my request to for NCR defense. He violated my trust and loyalty. He failed to inform me on this important decision. If it had not been for MR. Browns deficent performance underminding the Confidence in the outcome and his unprofessional errors, the result of the proceeding would have been different.

(6) I was denied my constitional guarenteed right to effective assistance of counsel when MR. Brown failed to investigate and present substantial mitigating evidence during Sentencing phase of my capital murder trial with evidence already prepared.

*No address*

(7) MR Brown had never tried a death penalty case before and was only allotted two weeks to prepare because of denied postponement.

(8) MR. Brown Knew the States witness where in the courtroom the entire trial (victims parents) and failed to object.

(9) MR. Brown called none of the witnesses that were already prepared and ready to go by the previous attorneys. His performance prejudice

④

My defense.

(10) Mr. Brown failed to adequately investigate and present evidence in mitigation of guilt. Mr. Brown performance fell below an objective standard of reasonableness, thus perdudicing my defense.

(11) Amanda Bull and Eric McDonnell my attorneys at my new sentencing hearing failed to object to a jury instruction that the jury was able to include their emotions and how they felt in the verdict. If it would not have been for the prosecutor saying yes to the jury's question of can they include their emotions in the verdict. I most likely wouldn't have been sentenced to life without parole it would have been a different outcome.

(12) Mr. Brown did not prepare for the competency issue that Ms. Bull and Mr. McDonnell were litigating. He did not contract the mental health experts that were already retained by previous Counsel and retained none of his own. He did not contract the examining court psychiatrist from the office of the Baltimore county Court house. Had he prepared for the competency hearing and contracted the already retained experts there was a strong possibility. I would have been found incompetent to stand trial. This prejudice my defense.

⑤

(13) The record reflects that upon the judge having
a conversation with my attorney and the state; DR.
Alizai interjects herself into the conversation and this
is where her testimony begins. She was never sworn in
or placed under oath. Therefore she was not subject to the
penalty of perjury or any other consequence for not telling the
truth or whatever came to mind in order to navigate the
proceedings her way or toward the states agenda, She
was sitting in the courtroom the entire time Dr. Inoye testified.
She simply backed up what he said. They both know the
great grand mother of the victim. Had the witness been sworn
in, her testimony would have been different, she would have
had to tell the truth and I would have been sent back
to Perkins for a proper inpatient evaluation and been found
incompetent to stand trial because of dissociating disorder.
DR. Alizai's testimony begins on page 185 and ends on 188
by stating her name for the record but was never sworn in (My
attorneys Ms Bull and Mr McDonnell never objected.)(According
to Maryland Criminal Procedure 11-403 it dictates
in no uncertain terms the requirement that the victim
be placed under oath. 11-403 (b)(2)[The court] may
allow the victim or victims representative to address the
Court under oath before the imposition of Sentence or
Other disposition at the request of the victim or victims
representative.) It was never placed on the record

⑥

at all as to why perkins made the decision
to Change the evaluation from court ordered inpatient
to outpatient (pg. 184: 13-16) MD. Rule 5-615
says witnesses are to be sequestered.

## Jury not impartial

The verdict must be based upon evidence at
trial regardless of the heinousness of the charge,
apparent guilt of the offender or his station in life. A
Juror must be able to lay aside his impressions
                                    (or Judge)
and be impartial. The prosecutor in my case approved
separate   of the Jury using their emotions to determine the verdict
trial    at sentencing. If it wouldn't have happen I probably
Would have recieved a lesser sentence.

## Sequestration violation by

There are portions in the transcripts that are
                                    (victim parents)
missing to show that the States witnesses where
in the courtroom during trial and made a loud outburst
at me. Following the Judge told them "if there was
anyone else who couldn't control themselves to please
leave the courtroom."

⑦

## Transcripts Omissions

(1) There were witnesses that were not sequestered during trial in my case (the victims mother) that made outburst at me in open court. The Judge than said If anyone can't control themselves please leave the courtroom - this is missing from my transcripts and is a violation of my right to a fair trial.

(2) prosecutal misconduct took place where the prosecutor called me a murderer in open court, this also is missing from my transcript.

## Prosecutorial Misconduct

The prosecutor (ms. Lewis) in the trial called me a murderer in open court before I was convicted of any crime.

## Government Intrusion

I was denied my right to a fair trial by the due process Clause of the fourteenth amendment. My right to assistance of counsel was damaged when all my work product was turned over to the State by mr. Brown. It communicated my entire defense Strategy to the prosecution.

In the Matter of
Jamaal K. Abeokuto

In the Circuit Court
for Baltimore County

VS
State of Maryland

Criminal Case No: 03-K-03-0021c

Application for Amendment & Addendum

Now comes the petitioner, Jamaal K. Abeokuto   ID # 323-969
pro se and in proper person, petitioning this Honorable Court, Seeking
relief under the uniform post conviction Procedure Act.

Allegations of Error and Concise Statement of Facts

Court order was violated because proper procedure was not kept for
mental health evaluation.

Maryland Rule 3-105 #2 Says "The Court Shall set and may change
the Conditions under which the examination is to be made".
(b). Except in a capital case, on consideration of the nature of the
charges the Court: May require or allow the examination to be done
out patient. In this case I was ordered to a inpatient evaluation at Clifton
T. perkins. The staff at Clifton T. perkins Changed it to outpatient and found
me competent. I was there for what they say was 2 hours. I believe this was done
deliberately because the victim in this cases' grandmother is a long time employee at
Clifton T. perkins. Therefore, it made the staff biased toward me because of the

(page 2)

publicity of this case and her working alongside them. They testified at my competency hearing "they had a bed" ready for me but did the evaluation out-patient (page 185: 14-19). The prosecutor said he saw nothing wrong with them changing the evaluation from inpatient to outpatient (even though Z was diagnosed with dissociating which has to be evaluated and diagnosed over a period of time) Obviously the prosecutor didn't know the law. (page 183: 3-6) Doctor Inyoue at perkins said himself that the diagnosis of dissociating is diagnosed over a period of time. It's not something that occurs frequently. So, how did he diagnose me is such a short period of time? ⊗¹³³ (Add) - My lawyers failed to object.)

## Ineffective Asst

② Mr. Warren Brown did not prepare for the competency essuse that ms.Bolland mr. McDonnell were litigating. He did not contract the mental health experts that were already retained by the court and retained none of his own. He did not contract the examining court psychiatrist's from the office of Baltimore county court house. Had he prepare for the competency hearing and contacted the already retained experts there was a strong possibility Z would have been found incompetent to stand trial. This prejudiced my defense.

③ The record reflects that upon the Judge having a conversation with my Attorn and the State, Dr Alizai interjects herself into the conversation and this is where her testimony begins. She was never placed under oath. Therefore, she was not subject to the penalty of perjury or any other consequence for not telling the truth or whatever comes to mind in order to navigate the proceeding her way or toward the states agenda She was sitting in the court room the entire time Dr Inoye testified. She could a simply backed up what he said. They both knew the grandmother of the victim. Had the witness been

(page 3)

Sworn in, her testimony would have been different, she would have had to tell the truth and Z would have been sent back to perkins for a proper inpatient evaluation and been found incompetent to stand trial because of dissociative disorder. DR. ALIZAI's testimony begins on page 185 and ends on 188 by stating her name for the record but was never sworn in) According to Maryland Criminal procedure 11- 403 it dictates in no uncertain terms the requirement that the victim/can be placed under oath. 11- 403 (b) (2) [The Court] may allow the victim or victims representative to address the court under oath before the imposition of Sentence or other disposition at the request of the victim or victims representative It was never placed on the record at all as to why perkins made the decision to change the evaluation from court ordered inpatient to out patient (pg 184:13-16)
MD. Rule 5-615 says witness are to be sequestered

Fact to
Hold
(Amanda prove objected)

Jamaal Abedruto 323-969
13800 McMullen Hwy, SW
Cumberland, MD 24502

Mr. Brown Failed to object because
before he took over the competency
hearing the Judge said he wanted on
the record why the evaluation was
change. That was never done.
pg. 178 & 21 - 188
next Note pages b4 cells)

Certificate of Service

I do hereby Certify that on this __10__ day of November 2010, a Copy of the Foregoing Petition for Amendment & Addendum was mailed postage paid to: The Court Clerks Office of Baltimore County

Jamaal Abershutta

(b) If you filed any second petition, application, or motion, give the same information:

    (1) Name of court: *Court of Special Appeals of Maryland*

    (2) Docket or case number (if you know): *03-K-03-2127*

    (3) Date of filing (if you know): *29th of April or May 2020*

    (4) Nature of the proceeding: *Appeal of Post Conviction*

    (5) Grounds raised:

*Attached is a copy of Application and Amendments to Leave to Appeal at the COSA. 18 pages.*

    (6) Did you receive a hearing where evidence was given on your petition, application, or motion?

    ☑ Yes    ☐ No

    (7) Result:

    (8) Date of result (if you know):

(c) If you filed any third petition, application, or motion, give the same information:

    (1) Name of court: *N/A*

    (2) Docket or case number (if you know):

    (3) Date of filing (if you know):

    (4) Nature of the proceeding:

    (5) Grounds raised:

Jamaal Abeokuto (Applicant)        In the Circuit Court For

323-969                            Baltimore County, MAryland

                                   Case# 1R000 35120

       vs

State of MAryland (Respondents)    Case# 03-K-03-2127

## Application For Leave to Appeal

Jamaal Abeokuto, Pursuant to Md. Rule 8-204, applies for leave
to appeal from the Judgement or order entered in the above-captioned case
on April 9th 2020.

## Allegations of Error

Now comes petitioner Jamaal Kenneth Abeokuto pro, se and I will
attempt to address issues and errors that have effected my trial and being
are not recorded in the record and also present errors. I will attempt
to provide you with a short, but complete, statement of the reasons why
the Judgement or order should be reversed do to errors committed
by the lower court.

1) Judge Ensor states in page 1 of her opinion that this was my
"second" petition but, the first Petition that I filed is the same petition
and was withdrawn without prejudice and per mr LAWLor was to be
Supplemented.

2) The court erred in alleging that "I", myself alleged that I was incompetent to stand Trial. Amanda Bull my Attorney at the time questioned it, not me. Page 3 of Judges opinion "The defense contested the finding of competence. Then She goes on to say," to ensure the defense a full opportunity to present its evidence... Judge Bollinger continued the hearing until August 16, 2004. At that time, after review of the testimony... and consideration of the reports (Warren Brown - the new Attorney) Submitted to a issue in a hearing he wasn't prepared for. To Enter his appearance in the middle of that issue was improper. He delayed his Appearance which we will see in attached - ACG (Response letter) Attorney Grievance Commission, he based his opinion on the perkins report (evaluation) and not the defense teams work.

(Footnote 3)
3) The court states I suggest that mrs. Bull and mr. macdonell also provided ineffective assistence in failing to object to a Jury instruction and that the claim was withdrawn. Judge Ensor in open court refused to allow mr Lawlor to withdraw my issues She stated, "that is not fair", she had read over all this and prepared for the issue and made him raise them. The State went over every issue but one she let me withdraw and tried to get them dismissed; she said no but withdrew them in her decision. That's an error and a issue I may have gotten relief on because a jury Can't include their emotions in a decision and they asked the question and the state answered yes, my lawyer didn't object.

4) footnote 4 - I did not withdraw the claim that the perkins evaluation was flawed (fns). She withdrew this after court, then she said she wasn't going to let us withdraw them. At the advice of counsel I withdraw one, she asked me about. But, I wanted to keep the issues. (Also); The Court of Special appeals encouraged us to raise all possible issues in its opinion in the Syed case. I felt better with her doing all the issues because mr. Lawlor never did the Supplement title he told me. All he told me was if we lose keep in touch with him because

the law has been changing about elemansy. (See transcript)

5.) The court of appeals has made clear, Postconviction proceeding are generally the preferred avenue of redress with respect to ineffective assistance of counsel claims because the record' rarely reveals why counsel acted or omitted to act, and such proceedings allow for fact finding and the introduction of testimony and evidence directly related to allegations of the counsel's ineffectiveness. that's why I don't understand why MR Lawler failed to use the evidence I presented to him of Warren Brown's dependency upon states' inaccurate evidence. His performance was deficant because he relied on perkins report and not the defense experts. This error was so serious he was not functioning as the "counsel" guaranteed the defendant by the six amendment. Because of his reliance on Dr. Inouye's inconsistant Report and testimony it prejudies my defense and ability to fair trial. Therefore it shows that my conviction was resulled from a breakdown in the adversary process that renders the result unreliable, I believe the Affirmative proves prejudice. I further find out at my post conviction hearing that Warren Brown who charged my mother $47,000 in 2002 to represent me, which she paid and he delayed his apperance amid numerous calls from family and the court as to what was taking him so long. He was holding up the case and the public defenders knew about it (August 6, 2004 & march 2004) 29, Pg1-12 Told us he had death penalty experience and admitted he (of post) said didn't to my surprise in open court", Amanda Bull she didn't and I didn't believe her. He was one of the main ones pulling my strings through the federal case, he told me to write Judge Byrnes to let him know I wanted Warren Brown to represent me, He knew I wasn't suppose to do that (page11) Warren Brown misled the Judge and didn't tell the truth, I've never knew him personally. He represented me in Juvenile court, He told Judge Enson he didn't remember where he met me and and said he knew me since I was a child and the Judge took it that way She emphasis child like it was early age childhood, as if he was around for my whole not. In 11th grade he represented me and the case was stetted,

Afterwards, he gave me a Job at his office as a intern, that was only 4-5 years before this case. I went to one work party at his home on christmas of 1997 with my daughter mom. There was no relationship outside this with Warren Brown. I've seen him once in public in 2002, the year of the offense, we both coached little league football and I saw him in passing. (Page 23 of Judges opinion)

On August 16, 2004, the last day of the competency hearing, Warren Brown called me a "strange creature" to the Judge and I asked mr Lawlor to file ineffective on this because Warren Brown didn't protect my innocence but futhermore he told me I would be found guilty and would try to beat the case by a tehnicality. This is not the language of someone who says he knows me personally since childhood, to tell the Judge I was a strange creature. He himself finds me competant but Lawlor never found any issues for me nor raise what I asked or suggested. (August 16, 2004 page 7-13) He doesn't mention to the Attorney Grievance Commission anything about having personal experince with me. He references to the 15 page perkins report. not any personal expeence at all or this is June 2009, I believe the attached will explain (AGC Response Letter) (Perkins Report show inconsistency see attached). I believe Judge Eason errored in accepting Warren Brawns experince with me, which he describes as being "personal" as the experince in mental health needed to determine whether or not to file the ncr I requested He Said "life is of a sound mind", You don't really have to be a weatherman to know which way the wind is blowing. You know enough about human nature, the ncrs, and competney, they stand out. They jump out at you (Judges opinion page 24) This qualifies him to make this decision, He said it would have been closed if he remembered me asking him that. I believe this stands as proof he would have dismissed it when I asked him about it. I worked as a intern for warren Brown in my high school co-op program in 12th grade, For about 2ohrs a week from 4pm to 5 pm monday-friday for about 100 a week, for less than a year and he let me go. There was not much time spent, I had half school days, to work the otha half, to prepare for college. He didn't

pages

read me any longer so, he let me go and I finish the school year.

Even if he didn't remember me asking him about the NCR, it should be in the experts notes he recieved from my defense team with the public defenders office, they were working on it. I didn't know what a NCR was until I learned it from my defense team because mrs stevenson said, I was close to it, it depended on Dr Seibert. WARREN Brown never returned the experts calls (march 6, 2007 - page 21:1-12 : DR Seibert who told me not criminally responsible) & (May 9, 2007 Page 53:5 - page 55 where he discusses treatment.) Treece VS State 1988 Say's it's ultimately my decision and not the lawyer nor the court to file NCR. Further information which is the June 9, 2009 letter to the Attorney Grievance Commission, reveals that Warren Brown depended on the Bstates Clifton T. Perkins report to decide if I was viable for NCR. Yet perkins never evaluated me for NCR. According to their report they explain to me and it was after asking me about it. I have never talked to perkins about the offense at all nor the time of the offense, Is it this required for criminal responsibility - Review the report they Just mention it not evaluate for it. They concluded I was competent Not, I was criminally responsible. Warren Brown never retained nor contacted my pre existing experts and me lawyer failed to raise this. He was given this information to file. DR Inouye: states June 22, 2004 (page 21: 14-16 & page 24: 3-17), that I was evaluated for competency to stand trial, that's his testimony but, he didn't state NCR but, he mentions it on the first page of his report (see Attached). Warren Brown later tells the Attorney Grievance Commission I was evaluated by perkins, for both and say's "See attachment" and attached the perkins report. After reviewing the perkins report, it does say this but, this is not what DR Inouye say's in court. HE Say's I was evaluated for competency, He never mentions NCR but, his report is different that's why I questioned his testimony from his original notes at perkins. Do they reflect his testimony. The Judge didn't order a NCR evaluation, (I believe this shows The Dr's bias toward the family against me and vindication for the family and victim in case. Warren Brown is wrong, I'm not saying I am the victim. I am saying this is a

tragedy, I don't understand and even if I wasn't afraid to tell the truth in the beginning. I should still have the privilege of a proper defense and representation and not be subject to people just trying to punish me and see me as un redeemable from the start. Where does it end! If there is help for me, where does it end!) This report may explains why Warren Brown would have dismissed me and said we can't use the NCR and didn't contact the experts and explain why it would have been absurd for me to ask about the NCR, I didn't talk to Inouye about the offense at all. He never evolute me for criminal responsibility. The Perkins report say's in the "Non-Confidentiality Statement", he writes Competency to stand trial & Criminal responsibility but, the evaluation itself only Ask if I knew what NCR is. In "Forensic Issue"; It say's competency to stand trial. In this section he states, (Dr Inouye) "I informed him that the statement of charges included Kidnapping... etc. Yet on June 22, 2004 (page 24: 6-17) Attached - He makes what he calls "one qualifying statement, Which is that I didn't read the application of statement of charges before interviewing me. Absolute but, this is not true. His evaluation states under "Forensic Issue" he states the charges in the evaluation on April 20, 2004. So if him reading the Statement of charges before the evaluation could have set a bias do to the nature of the case OR Knowing victims Family, that now goes out the window because we see that testimony is not true. Most likely Dr. Inouye and Dr Aliazai both read the statement of charges before hand, they interviewed me together. They both know the family of the victim. So, it is my opinion that they set out to attach malingering to both competency & criminal responsibility by this report, So I would have no relief from this offense either way, I would get death. They wouldn't have found in my favor at all for the Sake of this family, That's why he didn't tell the truth about what I told him in the evaluation he added to it. He made it worst, yet NO one else reported the things he did. This would render Warren Brown ineffective, So yes I believe the lower court got it wrong.

6) The Lower Court States on page 22 of its opinion that Dr Alizai "was not testifying at the time". Yet on page 26 of Judges opinion it is discussed at length how Dr Alizai sayd I was malingering and that she even observed my behavior in the court room. She was on the Stand behind Dr Inyove. They called her to the Stand to testify, Besides that, the Judge Says on page 21 of her opinion "the following day" Dr Kim Lee & Dr Alizai both testify regarding competency evaluation at perkins. She Say "June 22, 2004 transcript of proceeding". But I have the June 22, 2004 transcript and There is no Dr Kim Lee present in this transcript. Dr Alizai is the last to testify and her testimony ends the 22nd of June not the 21, 2004 of June as the court suggest. My counsel didn't object as footnote 4 Says and once again I didn't withdraw this issue.

7) The court States with my consent, that some of the issues initially raised by petitioner were withdrawn. This is Just not true. The post conviction transcript needs to be read. She wouldn't allow my Attorney to withdraw the issue. They had a spot where She Says, she doesn't care if he rolls his eyes". She allowed me myself to withdraw one with counsel consent. I would have let them all stay in, she withdrew them after court herself on her own. I believe this is a error.

8) The court States that Mr Brown explained that at the time the Jurors in Baltimore County "tended to be prostate". I don't recall this in court during post but it does bring to mind a issue I asked Mr Lawlor to raise when Woman Brown decided to go with Judge over Jury at trial because Judge Ballinger's son had been through Some things and he would be more Sympathetic and then white people in Baltimore county would hang me. Mr Lawlor never filed my supplement or additional issues so this would be ineffective

9) The court makes my point on page 12 of its opinion. MR Brown's thought process ... "was there was no kidnapping, so if I logically ask what was my defense? He put on no defense; he rested. He took my defense away by depending and relying on a Perkins report from DR Inouye that he couldn't even testify to and neither did any of his colleagues - DR Inouye or Alexei or Kim-lee (as the court states) on pages 21-23 DR Alexei Nor Kim-lee.- (as the court states) even mention any type of evaluation for criminal responsibility nor portions of it. Inouye's Report mentions it he didn't testify to it. Yet Warren Brown admits to the Attorney Grievance Commission (in attached Letter) June 9, 2009 that what he depended on his report April 20, 2004 (attached) and not personal experience with me as he stated at my post conviction. So yes, I believe the courts got this wrong and MR Lawton was ineffective because he had this ABC letter and the report was in the records, nobody compared his testimony to it Nor challenge warren Brown on it. He didn't raise my issue

10) The court says I did not identify the witnesses or the beneficial information they were ready to impart. For example I would present (attached March 6, 2007 page 21:1-12 where DR Seibert said Warren Brown never contacted him about his evaluation of the defendant but he contacted him to let him know he had information that would be helpful to him and he didn't return his call. Why wouldn't he return the call of my defense team who had info helpful to me - please keep in mind this is the DR who upon being retained again found me NCR. Which the actual statement is missing from the transcript but where he says, "He didn't believe I was able to conform my conduct to the requirements of the law"s.

Nov 14, 2007 pg 53:55) Amanda Bull retained him again with ERic McDonnell at new sentencing hearing but a month before trial warren Brown didn't retain him Nor return his call. I guess he won't remember that either". This would fall to MR Lawton being ineffective as I stood and told Judge Erson in court there was suppose to be a supplement filed and she said, "it wasn't done." And warren Brown did admit to me Lawton he never contacted the Loped witnesses and told the Judge he relied on his (9-5 years - 11th - 12 grade ex client) experience with me and

pro trade it as personal experience and not that he was my lawyer in Baltimore county, and then my boss for less than a year (Clerk Request Attachment) He could have informed him of my status on NCR- After all no one had evaluated me for it. (March 6, 2007 pg 21:8-9).

11) I've never seen a Dr. Kim-Lee testify (on June 22, 2004) I don't remember her at all or her testimony. To my knowledge the issue of inpatient out patient wasn't resolved and Warren Brown just came in and submitted. (Correct me if I'm wrong but, I can't do anything but sit there.) The last person to testify on this June 22nd date, the lower court refers to is Dr Alizai, you have two opinions one competent and another incompetent (page 180:6&14 &page 181). Judge Bollinger says, If we get someone from Perkins tomorrow which would the 23rd, How would the Hearing conclude on the 22nd of June, when it actually concluded on the 16th of August with Attorney Warren Brown calling me to the Judge a strange creature and in the same sentences tells the Judge I am competent - "he is now". and Submits. (He also admits to reviewing Dr Inouye testimony and submits. (To me it seems he may be the one pro-state and not the Jury of Baltimore county as the court suggested he said.) (August 16, 2004 page 6-8:7-12). Judge Enser has it wrong. Dr. Kim-Lee who's not in the transcript of June 22nd - the transcript is 188 pages and Alizai is last to testify, as I said. It really is incorrectable error: We don't know if I was competent or not at the time. Once again Warren Brown is not a expert to say I am competent without my experts, when he later enters his appearance. (Aug 16, 2004 page 6:13). I have no transcript that resolves the June 22, 2004 issue that Judge Bollinger brings up on page 181. On pages 187-188 the last pages of June 22, 2004 Dr Alizai states her name for the record by this court says she didn't testify. She answered questions at the end of what they needed the record complete. (see attached) & (Also attached) page 183-188 of June 22nd transcript & page 8 of original petition with Maryland Rule 3-105 which states only the court can change a evaluation in a capital case.

12. Mr Lawler was ineffective because I gave him all the information from the Clifton T. perkins & The Attorney Grievance Commission that shows that warren Brown relied on the perkins report for his decision on Not criminally Responsible when contradicts his post conviction testimony and Lawler did not prepare. He didn't challenge the credibility of the report and testimony from Dr Inouye that Warren Brown admits he relied on that contradict each other, Thus it jepredize my post conviction relief.

13. The court Found where victims mom blurted out in court in the transcript when was missing but didn't mention Finding, De Scribed in the transcript that was also missing saying, I was not Criminally responsible. Lawler said we need all the transcripts in open court and address the Ner by definition He was suppose to file this in the Supplement he said he filed, (May 4, 2007 page 53:5 - page 54:12) Mc Lawler did not prepare for this, I brought my May 4, 2007 & march 6, 2007 transcript to court and showed it to him and he used it. Because he kept telling me it was not in there, I showed him page 53 & 54 of may 4, 2007 or it wouldn't have been mentioned.

14) The court Never addressed the fact that the Victims great grand Parent worked (or works as of now) at 'Clifton T. perkins, I need to get from under this malingering aligation. Judge Enson took into Account Dr Inouye's & Alirai testimony but didn't take into account Dr Stevenson who spent atleast 25 hours with me and found me incompetent Nor Dr Seibert who Said partial malingering (may 4, 2007 pg 21:13 - pg. 24:11) As a scared 23 year old with No experience of life I was scared to tell the truth because I felt the truth was unbearble, it would cause them to Kill me. I Just couldn't bring my self to do it. I was scared! As I matured and my anxiety lessoned my conscience could be heard more clearly. I owed it to alot of people to tell the truth especially this family. I owed it to my defense team

So, I come clean and I ended up with a life sentence instead of death because I felt that no one would understand the truth even if I didn't. Dr. Seibert is a expert who has nothing to gain by lying for me but Dr. Inouye has a lot to gain for this family who is against me, that he has a relationship with at Perkins. The disappointing thing is he tried to strike vengence on me and we are suppose to be able to trust our Doctors and officials. He attempted to make it worse for me and they all got what they wanted, I was sentenced to **death**. Dr. Inouye told the truth about nothing I said, what I said he made worse, so it would work against me. I've wondered if his original notes from the interview reflect his testimony and Dr. Alizai was present in the interview but, she wasn't questioned about what I explained to them. She left shortly after. From Dr Alizai testmony on June 22, 2004 Warren ended on page 198 No mention of a Dr. Kimlee - the continuance and pick up with Warren Brown on August 16, 2004 mentioned. Perkins not

15) page 23 The court states that I "assert that mr. Brown failed to pursue and adequately discuss with him an NCR defense." The court furthermore states that my suggestion ignores completely mr Browns "significant" history with petitioner, (which we have discussed as not being true. He has been my lawyer as a Juvenile and afterwards my employer for a short term employer by may of 1998 I was no longer employed there - I know because when school ended and my daughter was born I didn't work for Warren Brown by then). The court refers to the testimony of Dr Inouye, Dr Alizai and Dr. Coleman which not one has testified in court to evaluating me for NCR. Inouye does not have it in his report as forensic findings he just mentions it and explains what it is. In my opinion to eliminate all possible mental health defenses with malingering. No one has reported me saying to them what he has. Dr Alizai wasn't even questioned about the report but she signed it (see attached - signed may 6 2004), The court says; " he was personally acquainted with" me long before Monciona's death. "Indeed, mr Brown and petitioner first met when he was a child" The court states the two spent a considerable amount of time together over the years as

More, Specifically Mr Brown hired me to work in his law office, and on occasions had petitioner at his home. Moreover, Mr Brown represented me in a federal matter related to the Same incident, and he had worked closely with him. As explained I met Mr Brown when he represented me in Baltimore County in 11th-12th grade in Juvenile court. After the Stet was put in in my case I asked him for a job and he hired me to be a intern in his office. It was their no longer than a year, by may 1998 the end of my senior year I was no longer there. He left me go. He didn't need me he said. Outside of work we had no relationship. I've been to his home for a christmas party for employees in 1997, this was the only time. He didn't work closely with me on the federal case the charges were dropped. He simple took the arguement he would have used in federal court and used it in State. What he argued in State court was really the Same, I was charged with Extortion federally he had the case so he argued, but the extortion and kidnapping in state court, He wasn't Sure if he wanted to take the states case. He was paid but prolonged his apperance dispite my family & the courts - Judge Byrnes trying to reach him (March 29, 2004 pg 1-12) but, strung me along all the chile, telling me to write the Judge as I kept asking him when he was going to enter his apperance, Like it wasn't on him to. It suprise me when he did it without warning in the middle of my competency hearing. I had only known Warren Brown 4-5 years in 2002, the time of the office. I met him when I was charged as a Juvenile. The plea of not guilty was not voluntaryly entered because I did not want to plea not guilty but was forced to because Warren Brown told me, the morning of the trial as I waited for him in the bull pen to tell him I wanted to go with NCR because I hadn't Seen him. He told me "we couldn't use that, that they were going to find me guilty but he would stry to beat the case by a technicality (I believe the court let me) He argued the

Indictment didn't say what I was Charged with and we know know
he based his NCR decision off Dr Inayes perkins Report (Attached Attorney
Grievance Commission letter, & Perkins Report & August 16, 2004 page 8: 7-12.) So
no matter what I say, he wouldn't have heard it and didn't call, contact nor
retain my experts, I Do believe the court has it wrong to find me Warren
Brown was effective and did his job on my behalf.

Additional Info: ① Warren Brown letter to the attorney grievance commission is troubling
one because alot of what he is arguing here is not in evidence, the most
troubling parts are not in evidence. not to discount that or say any of
it is not but is this the man who say's he knows me personally. He States'
" While standing behind her, slit her throat; and then picked up
a small log and beat her about the head until her body lay lifeless
on the frozen ground." I will not even begin to be insensitive and
pick this apart but it is not accurate by/to the standard of evidence.
Its offenses, inflammatory and used to trigger emotion. He
has shown he hardly knows me.

② From Dr. Alizai's Testimony on June 22, 2004 page 188 where it ends, with
no mention of a Dr. Kim-Lee ~ through the continuance to August 16th 2004
and Perkins is not mentioned - The issue was not resolved, There was no 23rd
of June - (Doc entries attached)

③ Dr Seibert had to stop his evaluation because new counsel but Mr Brown
didn't contact nor retain him. (page 20, March 6, 2007) when Mrs Bull retained
him again in 2006-2007 he said I could not conform my conduct to the requirments
of the law. — no one else evaluated me for NCR But Sorensen & Seibert (May 1, 2007 -
Page 53-55. The perkins report is titled, Competency hearing." — Not NCR Competency

④ The "forensic opinion" on page 15 of 15 on perkins report is competent - NCR not mentioned, Both Dr's Signed.

Jamaal Abeokuta

To the Circuit Court
of

Vs.

State of Maryland

Baltimore County
( C. C. 03A)
Case # 3-K-03-2122

Attachment of Explination
to Amendment for additional
evidence and additional allegations
of ERROR.

This petition includes references to attached documents, the
court already has from my new sentencing hearing of 2007
A) May 4, 2007  pg: 53-55 - DR. Siebert testimony
B) march 6, 2007 pages: 3-18  testimony of Janice Stevenson & Lori
monroe at new sentencing hearing. So please refer to the documents
you already have when these are referenced. I am limited in my funds
to make copies. Thankyou.

Jamaal Abeokuta
323-969, 1780656

Jamaal Abeokuto                          To the Circuit Court
          vs.                                      of
State of Maryland                        Baltimore County
                                         Case # 03-K-03-2127
                                         Case # 1R000 35120

               Motion to Amendment of Leave to Appeal
          to provide additional evidence, and additional
          allegations of error.

16.) Present here in the attached document Labeled Exhibit # 11 page
& Exhibit # 11 page 2 - page 113-125 that show the defense in my capital
murder death penalty case presented by mr. Warren A. Brown that I
ask mr. M. Lawlor to supplement the issue that there was no defense. When
Brown Abandoned the previous worked information done by the public defenders , turned over
the info from the previous defense experts but presented no case to rebut the
info testified to by the State. The witness change their previous testimony according
to that info at one point and there was no challenge to it. Warren Brown was
ineffective and mr. Lawlor failed to challenge it properly thus rendering him
ineffective at post conviction and The Court has it wrong to find that
Warren Brown was effective. I had no clue Warren Brown would do this.
I just lived through it trusting him even though I didn't understand it.
I was just as surprised as the Judge. I was a 23 year old young man who
was clueless to all of this. This is why I said to put the states case to no adversarial
testing and abandoned my defense.

                                         Jamaal Abeokuto

Page
of
Amendment

Addition Argument:

IF Warren Brown say's we were trying to find a way out turning over every stone (Judges post conviction opinion pages 28 & 29). Isn't he admitting that he abandoned the path of the research experts and deemed me sane himself based on his own experience and Never contacted the defense team who was doing the work when he entered his apperence and they later testified They actually believed I wasn't able to conform my conduct to the requirements of the Law (Dr. Saribets testimony at New sentencing hearing May 4th 2007 pages 53-55). There was a whole month lapse in their work from warren Browns apperence to the time of trial (See docket Entries) He didn't contact them (march 6th 200 pages 20-21) and (testimony of Lou monroe & Janice stevenson march 6th 200 page 3 - page 18 of new sentencing hearing proceedures Attached)

Jamaal Abdullah
323-969, 1780656

page 3

Attachment Allegation

(7)(A) Mr Brown argued he was court ordered to remove
all reports on work product but (page 21 of the docket entries
Exhibit A) Shows that on August 27, 2004 he was ordered
to make available information he "intended to use" (Just as in (Exhibit
I page 28). He had no intention on using experts as we see so
whats the purpose in turning over the information except to expose
the information to the State and leave me defenseless against it.

(B) He failed to challenge the order to "Submit to the examination"
that could and would cause me to incriminate my self because a
Judge ordered me to Submit to it (with no attorney and Mr Brown said go
ahead it wouldn't hurt anything. When I called him on the phone. Further
Mr Lawlor failed to raise it as asked, rendering them ineffective at post.

Jamaal Abeshito
323-969, 1780656



03-K-03-002127    Date:  05/14/18    Time:  15:23                    Page:  28

portion of Transcript, Sealed.*

| Num/Seq Description | Filed | Entered | Party | Jdg | Ruling | Closed | User ID |
|---|---|---|---|---|---|---|---|
| 00024000 State's Discovery Pursuant to Rule 4-343.* | 07/05/06 | 07/06/06 | 000 | | PC | 07/06/06 | KMI |
| 00025000 Revised Scheduling Order From Judge Cavanaugh | 07/10/06 | 07/11/06 | 000 | | TBA | 08/27/04 | RPT KNL |
| 00026000 Motion to Summons Tangible Evidence before trial.* | 07/11/06 | 07/11/06 | PLT001 | PC | Granted | 09/26/06 | KMI CLS |
| 00026001 Defendant's Answer To State's Motion For Subpoena For Tangible Evidence Before Trial | 07/12/06 | 07/12/06 | DEF001 | PC | | 08/27/04 | RPT KNL |
| 00026002 Criminal Order Order of Court granting State's summons for Tangible Evidence before Trial. (Warden of MCTC, medical records of Jamal Abeokuto) Writ issued. (PC) | 09/26/06 | 09/26/06 | 000 | | PC | 08/27/04 | CLS KNL |
| 00027000 Motion For Mental Examination Of Defendant* | 07/17/06 | 07/17/06 | PLT001 | PC | Ruled | 09/26/06 | RPT CLS |
| 00027001 Order of the Court that the Defendant, Jamaal K. Abeokuto, submit to any examination and testing by a psychiatric expert hired by the State; and it is further ordered that the reports, substance of any reports, the results of any tests administered, interviews and any other information related to an expert that the Defendant intends to have testify at the sentencing hearing be made available for review and inspection by the State's psychiatric expert.  (PC) | 07/25/06 | 07/25/06 | 000 | | PC Granted | 07/25/06 | KMI |
| 00027002 Criminal Order Order of Court that the Defendant submit to any examination and testing by a psychiatric expert hired by the State. | 09/26/06 | 09/26/06 | 000 | | PC Ruled | 09/26/06 | CLS |
| 00028000 Order For Pre-Sentence Investigation/Victim Impact Statement and Special Court Investigation Updating Pre-Sentence Investigation, Specifically Adjustment and Health (Institutional) by 10/01/06. (PC) | 07/17/06 | 07/17/06 | 000 | | TBA | 07/17/06 | KMI |
| 00029000 Misc Document Defendant's answer to state's motion for mental examination of defendant. * | 07/19/06 | 07/21/06 | 000 | | TBA | 08/27/04 | JLP KNL |
| 00030000 Request for Extension of time to Complete Expert Evaluation | 08/30/06 | 08/31/06 | 000 | | TBA | 08/27/04 | KNL KNL |
| 00031000 Request for Extension of time to | 09/05/06 | 09/05/06 | DEF001 | TBA | Denied | 09/12/06 | KMI JAM |

Jamaal Absoluto                    In the Circuit Court

323-969                                    For

vs.                                Baltimore County

State of Maryland                  Case # 03-K-03-2127

                                   Case # 120000 35120


Certificate of Service For

Motion to Amendment of Leave to Appeal & provide additional
evidence and additional allegations of Error.


I Hereby Certify under the penalty of Perjury that on ____
____ 2020, I am acknowledging that the above info is true and accurate
and has been sent to the Clerk of the Court for Baltimore County
(two copies) at 401 Bosley Avenue Towson, Maryland 21285-
6754 and to the Attorney, Criminal Appeals Division, 200 St. Paul
Place, Baltimore, Maryland 21202 (one copy) First Class mail.


                              Jamal Absoluto
                              323-969, 1790656

AO 241
(Rev. 01/15)

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

❏ Yes     ❏ No

(7) Result: _____

(8) Date of result (if you know): _____

(d) Did you appeal to the highest state court having jurisdiction over the action taken on your petition, application,

or motion?

(1) First petition:     ☑ Yes     ❏ No

(2) Second petition:     ❏ Yes     ❏ No

(3) Third petition:     ❏ Yes     ❏ No

(e) If you did not appeal to the highest state court having jurisdiction, explain why you did not:

_____

_____

12.    For this petition, state every ground on which you claim that you are being held in violation of the Constitution,
laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts
supporting each ground.  *See Attached Ground (6 pages)*

**CAUTION: To proceed in the federal court, you must ordinarily first exhaust (use up) your available
state-court remedies on each ground on which you request action by the federal court. Also, if you fail to set
forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.**

**GROUND ONE:**  Warren A. Brown acts & omissions were outside the wide
range of professional competents assistance. Therefore he is ineffective

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

Mr Brown chose to pursue no other defense besides beating the case
on a technicality on the indictment and later statesat post conviction. He
doesn't remember me asking to go with the NCR, that would have be "absurd".
Post conviction court error in withdrawing the issue after court when first
stated in court She would not withdraw them. Force my Attorney to go forward
with them and he ended up leaving them to the mercy of the transript. He was not
prepared also at post conviction. The proceedure should be reversed in entirety,

(b) If you did not exhaust your state remedies on Ground One, explain why: _____

_____

_____

_____

_____

_____

AO 241
(Rev. 01/15)

Page 7

(c)     **Direct Appeal of Ground One:**

(1) If you appealed from the judgment of conviction, did you raise this issue?     ☐ Yes     ☑ No

(2) If you did not raise this issue in your direct appeal, explain why:   Ineffective is a post

Conviction issue,

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☑ Yes     ☐ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition:   Post Conviction petition

Name and location of the court where the motion or petition was filed:   Circuit Court for

Baltimore County

Docket or case number (if you know):   03-K-03-002127

Date of the court's decision:   April 9, 2020

Result (attach a copy of the court's opinion or order, if available):   - Attached -

(3) Did you receive a hearing on your motion or petition?     ☑ Yes     ☐ No

(4) Did you appeal from the denial of your motion or petition?     ☑ Yes     ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?     ☑ Yes     ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed:   Court of Special Appeals

of Maryland See Attached

Docket or case number (if you know):   03-K-03-002127

Date of the court's decision:   May 25, 2021

Result (attach a copy of the court's opinion or order, if available):   -See Attached-

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:



**CIRCUIT COURT FOR BALTIMORE COUNTY, MARYLAND**
401 Bosley Avenue, P.O. Box 6754
Towson, MD  21285-6754

Main: 410-887-2601
Fax: 410-887-3062

**To:**   JAMAAL KENNETH ABEOKUTO
Inmate #: 323-969
WESTERN CORRECTIONAL INSTIT
13800 MCMULLEN HWY SW
CUMBERLAND MD 21502

| | |
|---|---|
| **Case Number:** | 03-K-03-002127 |
| **Tracking Number:** | |
| **Related Case Number:** | 12-K-03-000310 |

## STATE OF MARYLAND VS JAMAAL KENNETH ABEOKUTO

| | | |
|---|---|---|
| JAMAAL K. ABEOKUTO | * | IN THE |
| Petitioner | * | CIRCUIT COURT |
| v. | * | FOR |
| STATE OF MARYLAND | * | BALTIMORE COUNTY |
| Respondent | * | Case No. 03-K-03-2127 |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Currently pending before the Court is the Petition for Post Conviction Relief (Paper No. 135,000) (the "Petition"), filed on January 16, 2013, by Jamaal K. Abeokuto (sometimes "Petitioner" or "Mr. Abeokuto") without the benefit of counsel. [1] The State filed its Answer (Paper No. 137,000) on January 29, 2013, and its Memorandum in Support of its Answer on April 4, 2019. The matter was heard on August 26, 2019. Counsel for Mr. Abeokuto then filed, on August 28, 2019, what was termed a "Post-Hearing Supplemental Argument." The Court has considered the entire file, including Mr. Abeokuto's Petition, the State's Answer and Memorandum in Support, the testimony provided, the arguments presented during the hearing, the post-hearing supplement, the transcripts, and the relevant law. For the reasons outlined below, Mr. Abeokuto's request for post conviction relief will be denied in its entirety. A separate Order follows this Opinion.

Entered: Clerk, Circuit Court for
Baltimore County, MD
April 13, 2020

---

[1]    Mr. Abeokuto indicates that this is his "first petition for relief under this act." It is, in fact, his second petition. The first Petition for Post Conviction Relief was filed on June 10, 2009, and subsequently withdrawn.

cc:  SAO, Defense Atty, Defendant

## **BACKGROUND**

On or about March 4, 2003, in the Circuit Court for Harford County, Mr. Abeokuto was charged via a six-count indictment with Murder in the First Degree (Count One), Assault (Count Two), Extortion (Count Three), Kidnapping (Count Four), Wearing or Carrying a Dangerous Weapon Openly with Intent to Injure (Count Five), and Child Kidnapping (Count Six). Specifically, Mr. Abeokuto was charged with the murder of his girlfriend's eight-year-old daughter, Marciana Ringo. On March 5, 2003, the State notified Petitioner that it was seeking the death penalty. The notice was hand-delivered directly to Mr. Abeokuto and also sent to his attorneys. Counsel from the Office of the Public Defender, Deputy District Public Defender Amanda Bull and Assistant Public Defender Eric MacDonnell, formally entered their appearance on behalf of Mr. Abeokuto on March 6, 2003. Several weeks later, on May 16, 2003, Petitioner filed a suggestion of removal. The Honorable John Grason Turnbull, II, Third Circuit Administrative Judge, ordered, on June 10, 2003, that the matter be transferred to the Circuit Court for Baltimore County. Initially, the case was assigned specially to the Honorable J. Norris Byrnes and was scheduled for trial on January 26, 2004. The matter was postponed at the request of Mr. Abeokuto and rescheduled for April 6, 2004. Prior to the April trial date, however, Judge Byrnes fell ill; the case was reassigned on March 31, 2004, to the Honorable Thomas J. Bollinger.

Jury selection began on April 6, 2004, but was not completed as, on April 8, 2004, Mr. Abeokuto alleged that he was incompetent to stand trial. Dr. David Waltos conducted

2

a pre-trial evaluation at that time. Dr. Waltos opined, to a reasonable degree of medical probability, that Mr. Abeokuto understood the nature of the pending charges. There was a concern, however, that he may not have been able to consult sufficiently with counsel. The case was postponed. On April 14, 2004, Judge Bollinger ordered that Mr. Abeokuto be examined for competency to stand trial.

Pursuant to that order, Dr. Inouye conducted a further evaluation of Mr. Abeokuto. He personally evaluated Petitioner on April 20, 2004. He also reviewed numerous documents, including the April 28, 2003, health assessment performed at the Harford County Detention Center, the November 3, 2003, psychologist's evaluation, the April 8, 2004, psychiatric evaluation, and the April 13, 2004, re-evaluation. Dr. Inouye noted that Mr. Abeokuto had no history of psychiatric treatment. He offered the opinion that, although Mr. Abeokuto suffered from anxiety and depression, he otherwise was malingering and competent to stand trial. The defense contested the finding of competence and asked "that the case be set for a hearing on competence prior to proceeding with the trial." May 19, 2004, transcript of proceedings ("5/19 Tr.") at 3.

The case was scheduled for a competency hearing on June 21 and 22, 2004. Unfortunately, due to a health issue, Dr. Waltos was not available to testify on those dates. Judge Bollinger heard two days of testimony and then, in order to ensure the defense a full opportunity to present its evidence on the issue of competency, continued the hearing until August 16, 2004. At that time, after "review of the testimony . . . and consideration of the reports submitted," Judge Bollinger found "that Mr. Abeokuto was and is competent to

3

stand trial and to aid and assist his counsel in his defense." August 16, 2004, transcript of proceedings ("8/16 Tr.") at 8.

Warren Brown ("Trial Counsel" or "Mr. Brown") entered his appearance on behalf of Mr. Abeokuto on or about July 19, 2004. The State objected to the notice to strike the appearance of Amanda Bull and Eric MacDonnell, explaining that it did not want to have the case again postponed as a result of a new attorney entering his appearance. On August 6, 2004, Judge Bollinger struck the appearance of Ms. Bull and Mr. MacDonnell but denied Mr. Brown's request for postponement. As already mentioned, following the conclusion of the competency hearing on August 16, 2004, Judge Bollinger found Mr. Abeokuto competent to stand trial. Petitioner then elected to be tried by the Court.

The trial proceeded before Judge Bollinger on August 23–27, 2004. At the conclusion of the case, Judge Bollinger found Mr. Abeokuto guilty of all charges.[2] Petitioner then elected to be sentenced by Judge Bollinger. Disposition was scheduled for November 15–17, 2004. Judge Bollinger ultimately sentenced Mr. Abeokuto to death plus 43 years.

Mr. Abeokuto appealed his convictions. On February 13, 2006, the Court of Appeals affirmed the judgments but vacated the sentence and remanded the case for a new sentencing hearing. On May 19, 2006, Ms. Bull and Mr. MacDonnell re-entered their appearance on behalf of Mr. Abeokuto. Judge Bollinger granted a Motion to Recuse himself on June 15, 2006; the case was transferred to the Honorable Patrick Cavanaugh for the new sentencing hearing.

---

[2]     Judge Bollinger subsequently denied Petitioner's Motion for a New Trial.

4

The matter was scheduled for resentencing on November 20, 2006. Roughly one month prior, on October 19, 2006, Mr. Abeokuto notified the Court of his election to be sentenced by a jury. As a result of a late-filed *motion in limine*, the sentencing was postponed and rescheduled for April 18, 2007. The matter again was postponed and reset for April 23, 2007. Jury selection began on April 23rd and concluded on April 26, 2007. Following a multi-day hearing, the jury determined that the appropriate sentence as to Count One, the First Degree Murder of Marciana Ringo, was a term of life, without the possibility of parole, to be served consecutively to any and all other present sentences.

On June 10, 2009, Mr. Abeokuto filed, without the benefit of counsel, a Petition for Post Conviction Relief, claiming, among other things, ineffective assistance of counsel. Mr. Abeokuto later filed an Application for Amendment and Addendum. On September 26, 2011, however, he filed a Motion to Withdraw the Petition for Post Conviction Relief, which was granted. On January 16, 2013, Mr. Abeokuto essentially re-filed his initial Petition for Post Conviction Relief. In addition to raising the allegations lodged in the initial petition, Mr. Abeokuto claimed that the competency evaluation was flawed because it was not performed on an in-patient basis.

The matter was scheduled for hearing on multiple occasions but postponed at Mr. Abeokuto's request. Current counsel entered his appearance on behalf of Mr. Abeokuto on April 2, 2014. Following additional postponements, the case was heard on August 26, 2019. Mr. Brown and Mr. Abeokuto both testified.

# DISCUSSION

## I. Waiver

Pursuant to MD. Crim. Proc. § 7-106(b), "an allegation of error is waived when a petitioner could have made but intelligently and knowingly failed to make the allegation:

1. before trial;

2. at trial;

3. on direct appeal, whether or not the petitioner took an appeal;

4. in an application for leave to appeal a conviction based on a guilty plea;

5. in a habeas corpus or coram nobis proceeding began by the petitioner;

6. in a prior petition under this subtitle; or

7. in any other proceeding that the petitioner began."

The "intelligent and knowing" standard only applies if the claim asserted is a fundamental right. *State v. Torres*, 86 Md. App. 560, 568 (1991). If the claim asserted is not a fundamental right, the Court will look to general legal principles to determine if the claim has been waived. *Id.* "The most significant of these principles is that the failure to exercise a prior opportunity to raise an allegation of error generally effects a waiver of right to raise the matter at a later time." *Id.* "Fundamental rights have been defined as being, almost without exception, basic rights of constitutional origin, whether federal or state, that have been guaranteed to a criminal defendant in order to preserve a fair trial and the reliability of the truth-determining process." *Wyche v. State*, 53 Md. App. 403, 406 (1983) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 236 (1973)).

6

The Court of Appeals also has made clear that the "intelligent and knowing" standard does not apply to every constitutional right. *Oken v. State*, 343 Md. 256 (1996). For example, "tactical decisions, when made by an authorized competent attorney, as well as legitimate procedural requirements, will normally bind a criminal defendant." *Curtis v. State*, 284 Md. 132, 150 (1978). Fundamental rights, in which the "intelligent and knowing" standard has been found to apply are: (1) the Sixth Amendment right to assistance of counsel; (2) the right to trial by jury; (3) rights regarding guilty pleas; (4) rights regarding Fifth Amendment self-incrimination; (5) rights granted by the Double Jeopardy Clause; (6) the Sixth Amendment right to be present at trial to confront witnesses; (7) the right to speedy trial; and (8) the right to counsel at post indictment pre-trial lineup. *Wyche*, 53 Md. App. at 406.

Even in situations in which the "intelligent and knowing" standard does apply, "[w]hen a petitioner could have made an allegation of error . . . but did not . . ., there is a rebuttable presumption that the petitioner intelligently and knowingly failed" to do so. Md. Code Ann., Crim. Proc.§ 7-106(b)(2). The "[f]ailure to make an allegation of error shall be excused if special circumstances exist." § 7-106(b)(1)(ii)(1). The burden of proving *special circumstances* rests with the petitioner. § 7-106(b)(1)(ii)(2).

In addition, the Court of Appeals has held that a post conviction proceeding is the most appropriate way to raise a claim of ineffectiveness of counsel. *Mosley v. State*, 378 Md. 548, 558-59 (2003). This is, at least in part, because the Maryland Uniform Post Conviction Procedure Act allows for "the possibility of an evidentiary hearing, reflecting a recognition that 'adequate procedures exist at the trial level, as distinguished from the

7

appellate level, for taking testimony, receiving evidence, and making factual findings thereon concerning the allegations of error.'" *Id.* at 560 (quoting *Wilson v. State*, 284 Md. 664, 675 (1979)). Moreover, as the Court of Appeals has made clear, post conviction proceedings are generally the preferred avenue of redress with respect to ineffective assistance of counsel claims because the record "rarely reveals why counsel acted or omitted to act, and such proceedings allow for fact-finding and the introduction of testimony and evidence directly related to allegations of the counsel's ineffectiveness." *Id.* Thus, a number of issues raised by Petitioner have been waived.[3] Mr. Abeokuto has not waived the allegations that Mr. Brown provided ineffective assistance.[4]

### II. Ineffective Assistance of Counsel

The United States Supreme Court has stated that the right to counsel under the Sixth Amendment necessarily includes the right to "effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)). The inquiry as to whether counsel rendered ineffective assistance is conducted pursuant to a two-pronged test:

> [f]irst, the defendant must show that counsel's performance
> was deficient. This requires showing that counsel made errors
> so serious that counsel was not functioning as the "counsel"
> guaranteed the defendant by the Sixth Amendment. Second,

---

[3]     For instance, Petitioner argues that Dr. Alizai "was never sworn in or placed under oath." He finds fault with the fact that Dr. Alizai "was sitting in the courtroom the entire time Dr. Inouye testified." Mr. Abeokuto also boldly claims that the jury was "not impartial." He suggests that "[t]here are portions in the transcripts that are missing," and that the prosecutor engaged in misconduct by calling him a "murderer in open court before [he] was convicted of any crime." Each of these allegations has been waived. Were they not waived, they do not constitute grounds for post conviction relief.

[4]     Petitioner initially suggested that Ms. Bull and Mr. MacDonnell also provided ineffective assistance in failing to object to a jury instruction. That claim was withdrawn. There remains a hint of a suggestion that they were ineffective in failing to object to Dr. Alizai answering some logistical questions from Judge Bollinger at the end of the first day of the competency hearing. This vague claim has no merit, especially since Mr. Abeokuto has withdrawn the claim that the Perkins evaluation was flawed. *See* fn 5.

> the defendant must show that the deficient performance
> prejudiced the defense. This requires showing that counsel's
> errors were so serious as to deprive the defendant of a fair trial,
> a trial whose result is reliable. Unless a defendant makes both
> showings, it cannot be said that the conviction ... resulted from
> a breakdown in the adversary process that renders the result
> unreliable.

*Id.* at 687.

In order to prove deficient performance, "the defendant must: (1) demonstrate that

counsel's acts or omissions, given the circumstances, fell below an objective standard of

reasonableness considering prevailing professional norms, and (2) overcome the

presumption that the challenged conduct be considered sound trial strategy." *Evans v.

State*, 151 Md. App. 365, 373 (2003) (quoting *Wiggins v. State*, 352 Md. 580, 602 (1999)).

In assessing counsel's performance, this Court must be "highly deferential" and "indulge

a strong presumption that counsel's conduct falls within the wide range of reasonable

professional assistance." *Id.* (quoting *Strickland*, 466 U.S. at 689).

In evaluating the prejudice prong, our Court of Appeals has defined prejudice as "a

substantial possibility that, but for counsel's error, the result of [the petitioner's] proceeding

would have been different." *Smith v. State*, 394 Md. 184, 209 (2006) (quoting *In re Parris

W.*, 363 Md. 717, 727–28 (2001)). The petitioner's burden under the prejudice prong may

not be taken lightly; it is a difficult hurdle to overcome. A defendant must "affirmatively

prove prejudice." *Harris v. State*, 303 Md. 685, 699 (1985) (quoting *Strickland*, 466 U.S.

at 693). Merely alleging that some errors "had *some conceivable effect* on the outcome of

the proceeding, or that errors *impaired* the presentation of the defense" is not sufficient.

*Id.* at 700 (emphases in original).

### III. Allegations Raised

At the August 26, 2019, hearing, counsel for Mr. Abeokuto, with his client's consent, withdrew some of the issues initially raised by Petitioner in his January 16, 2013, Petition for Post Conviction Relief.[5] In addition, as already mentioned, several of the issues raised have been waived. That said, still viable and requiring determination are the many allegations that Mr. Brown provided ineffective assistance.

Initially, Mr. Abeokuto was represented by Amanda Bull and Eric MacDonnell, with the Office of the Public Defender. Prior to trial, however, Mr. Abeokuto discharged Ms. Bull and Mr. MacDonnell and retained Warren Brown to represent him. As pointed out by Ms. Bull in argument before Judge Bollinger, Mr. Abeokuto was "entitled to counsel of choice." August 6, 2004, transcript of proceedings ("8/6 Tr.") at 3. "He expressed that choice back in March [2004] in a letter to Judge Byrnes requesting that [Ms. Bull and Mr. MacDonnell] be discharged from the case, and that Mr. Brown enter." *Id.* In fact, Mr. Brown already was familiar with the case as he represented Petitioner in "a companion federal case . . . related to this incident." *Id.* at 8.

---

[5]       The following allegations were withdrawn:

(1) That Mr. Brown provided ineffective assistance because he represented Mr. Abeokuto "in a capital case without a second chair while the State had two chairs;"

(2) That Mr. Brown provided ineffective assistance by failing "to investigate and present substantial mitigating evidence during [the] sentencing phase;"

(3) That Mr. Brown provided ineffective assistance because he "had never tried a death penalty case before;"

(4) That Mr. Brown provided ineffective assistance by failing "to adequately investigate and present evidence in mitigation of guilt;"

(5) That Amanda Bull and Eric MacDonnell provided ineffective assistance by failing "to object to a jury instruction that the jury was able to include their emotions and how they felt in the verdict;"

(6) That the jury was "not impartial;" and

(7) That the "Court Order was violated when proper procedure was not followed or kept for [the] mental health evaluation" at Clifton T. Perkins Medical Center.

10

Mr. Brown was admitted to the Maryland Bar in 1980 and, since then, has practiced all over the State, exclusively in the area of criminal defense.[6] Prior to being retained to represent Mr. Abeokuto, Mr. Brown had represented approximately 120 individuals charged with murder.[7] He is well known and enjoys a very fine representation in the legal community.

Mr. Brown was called as a witness at the August 26, 2019, hearing. At that time, Mr. Brown testified credibly and convincingly regarding his prior personal knowledge of and interactions with Mr. Abeokuto. According to Mr. Brown, Mr. Abeokuto was "not unknown to him." In fact, Mr. Brown explained that Petitioner was a child when they first met and that he and Mr. Abeokuto spent a considerable amount of time together over the years. Indeed, Mr. Brown hired Mr. Abeokuto to work in Mr. Brown's law office and, on occasion, had Petitioner to his home. Mr. Brown testified that, based on his significant personal interactions with Petitioner, the question of criminal responsibility was "a complete non-issue." Mr. Brown added that he understood why an attorney with no prior relationship with Mr. Abeokuto would seek to engage an expert witness regarding criminal responsibility, but, in his opinion, it was completely unnecessary.

Mr. Brown testified that his intention was to map out an exit strategy for Mr. Abeokuto. According to Mr. Brown, the State's case against Petitioner "was very, very strong." In addition, Mr. Brown explained that, at the time of trial, the jurors in Baltimore County "tended to be pro state."

---

[6]   Mr. Brown also has represented defendants in the courts of New York, Delaware, Virginia, and Pennsylvania.
[7]   Mr. Brown, however, had not represented a defendant for whom the State was seeking a sentence of death.

Mr. Brown testified that his specific strategy at the time of trial was to undermine the strength of the State's case regarding the kidnapping charge. Mr. Brown explained that he "intended to chip away at the State's case" but wanted to focus on the kidnapping charge as it could serve as an aggravating factor for the death penalty.[8]  At the post conviction hearing, Mr. Brown explained his thought process:

> the strategy at the time of trial was to undermine the predicate for the death penalty, which would have been, in this case, kidnapping, so I concluded, in my mind, that the State had a very, very strong case that he had committed this act. The question was in my mind... [was there] proof beyond a reasonable doubt of the kidnapping? Because my thought was there's no kidnapping, then you don't have that aggravating factor that would lead to the death penalty.

August 26, 2019, audio recording of hearing ("AR") at 10:04:33 a.m. – 10:05:15 a.m. Mr. Brown needed an exit strategy because, "[g]oing in [to trial], it looked bleak in terms of culpability with regard to the actual murder." AR at 10:06:20 a.m. – 10:06:30 a.m.

According to Mr. Abeokuto, Trial Counsel's "acts and omissions were outside the wide range of professional, competent assistance." Petitioner claims that Mr. Brown "put the State's case to no adversarial testing," that Mr. Brown "hardly cross examined any of the State's witnesses at all," and that Mr. Brown "had no defense," other than "beating the case on a technicality." A review of the trial transcripts belies these assertions.

---

[8]      The evidence against Mr. Abeokuto was significant, if not overwhelming. By way of example, Mr. Abeokuto was the last person seen with the victim. He was seen putting the little girl in his car. He lied to the victim's mother when she inquired about the child's whereabouts. He was late for work and was later observed buying a new pair of jeans at the Walmart in Aberdeen. The receipt for the jeans was found in his car. A pair of jeans identified as belonging to him was found near the victim's apartment. The victim's blood was found on the jeans. A bloody pair of Petitioner's work gloves were recovered; the blood was that of Marciana. The ransom note contained Petitioner's DNA and fingerprint.

12

Mr. Brown employed a readily discernable trial strategy. Clearly, his intent was to protect his client from a sentence of death. Therefore, Mr. Brown focused particularly on the kidnapping and child abduction counts, convictions for which could be considered aggravating circumstances vis-à-vis imposition of the death penalty.

Mr. Brown's plan was clear from the start. In his opening statement, he told Judge Bollinger that Mr. Abeokuto, over the course of his relationship with Ms. White, "developed a very close relationship" with her children. August 23, 2004, transcript of proceedings ("8/23 Tr.") at 14. Mr. Brown explained that his client "would do all the things that a natural parent would do." *Id.* According to Mr. Brown, Mr. Abeokuto went to Marciana's PTA meetings, took Marciana to the pediatrician, and "would take care of her when Ms. White was either working or out socializing." *Id.* Trial Counsel pointed out to Judge Bollinger that Ms. White "last saw her daughter when she had left her in the *custody* of Mr. Abeokuto." *Id.* (emphasis added). Mr. Brown claimed that Mr. Abeokuto "had custody" of Marciana on the morning of her disappearance and that "he was a parent to [her] on this particular day." *Id.* at 15.

In addition, with respect to the extortion charge, Mr. Brown indicated that "there was not a lot of money to be had," and that "they were paycheck to paycheck." *Id.* at 16. He pointed out that Ms. White and Mr. Abeokuto had "access to the same account and . . . there was rarely much money" in it. *Id.* According to Mr. Brown, the evidence would show that "there was no way that [Mr. Abeokuto] would have sent [a ransom note] with the intent to receive any monies." *Id.* Trial Counsel reiterated that "there would have been no way that that would have been sent with the intent, expectation of receiving any monies

in the amount of $5,000." *Id.* Indeed, Mr. Brown mentioned that the letter "may have been sent for purpose of, first of all, creating a different trail, of diverting attention from him but it was not sent with the intent to receive any, extort any monies because he knew there wasn't any monies to be had. . . ." *Id.* at 17.

In a nutshell, Mr. Brown stated the position that, "when all the evidence is in, dust settles and the smoke clears that certainly the State will have fallen short of convincing this Honorable Court beyond a reasonable doubt that there was a kidnapping or a child abduction or for that matter an extortion in this case." *Id.* at 18.

Mr. Brown followed through with this strategy in his cross examination of Ms. White. For example, upon questioning by Mr. Brown, Ms. White conceded that she had been in a relationship with Petitioner for roughly two years prior to Marciana's death. *Id.* at 81. She agreed that Mr. Abeokuto had full access to the home and that the children would run to the door whenever he put his key in the lock. *Id.* When asked, Ms. White admitted that Mr. Abeokuto was very active in the lives of both Marciana and her brother, Mark. *Id.* at 84. Ms. White agreed that Mr. Abeokuto was a father figure to both children. *Id.* at 87. She granted that the children even referred to Mr. Abeokuto as "Daddy-mall." *Id.* at 94. Ms. White also admitted that, on at least a handful of occasions, Mr. Abeokuto gave Marciana a ride to school, just as he claimed he did in this case. *Id.* at 92. Ms. White further agreed that Mr. Abeokuto was listed as an emergency contact at school because she felt comfortable giving him the authority to act on behalf of Marciana in the event of an emergency. *Id.* at 93.

With respect to the extortion charge, Mr. Brown questioned Ms. White regarding her finances and those she shared with Mr. Abeokuto. Ms. White confirmed that she and Petitioner "had an account together at SECU." *Id.* at 98.

Mr. Brown's cross examination of Mark Ringo, Marciana's father, was focused and to the point. Mr. Brown established that, when Mr. Ringo's son came out to the car that morning, he did not indicate anything unusual with regard to Marciana. *Id.* at 134.

Mr. Brown also used cross examination to highlight discrepancies in testimony. For example, he asked questions of Constance Greene, pointing out on several occasions the inconsistencies in her statement to the police and her testimony in court. For instance, in court, Ms. Greene testified that she saw Marciana "standing on the passenger side" of Mr. Abeokuto's car, "[j]ust leaning in," and "talking to Jamaal." *Id.* at 138, 139. Ms. Greene then testified that she saw Marciana get "in the passenger side . . . in the back." *Id.* at 140. Upon questioning by Mr. Brown, Ms. Greene admitted that she told the police that she saw Marciana running to Mr. Abeokuto's red car. *Id.* at 144. She also admitted that she told the police that Marciana got in on the driver's side of the car. *Id.* at 145. Importantly, upon further questioning by Mr. Brown, Ms. Greene was forced to admit that she told the police she wasn't actually sure who was in the car. *Id.* at 144. Ms. Greene further conceded that, when she saw Marciana, the child did not appear to be "under any kind of stress, duress, force or anything like that." *Id.* at 145.

Indeed, Mr. Brown cross examined many of the State's witnesses. As already mentioned, his inquiry was direct and focused. With respect to Dwayne Carter, Mr. Brown was able to establish that "swiping the card was something that [the employees] sometimes

15

did, [they] weren't supposed to do but all sometimes did for each other . . . ." August 24, 2004, transcript of proceedings ("8/24 Tr.") at 9.  Similarly, upon questioning by Mr. Brown, Thedrick Tapp admitted that "it was common practice . . . for employees to swipe each other's cards in and out . . . ." *Id.* at 21.

Through his cross examination of Detective Gary Hoover, Mr. Brown attacked the State's extortion charge.  He highlighted the ambiguities in the letter Ms. White received on December 5, 2002.  At the request of Mr. Brown, Detective Hoover read the letter into the record – "tell Stark want five thousand, put to bag and put in men bathroom at Druid Hill Park by 8 p.m. [tomorrow] or girl dies.  If she die I just say we even, an eye for an eye." *Id.* at 73.  In questioning Detective Hoover, Mr. Brown was able to show that the instructions in the letter were vague.  For instance, when was the money to be delivered? What did the author mean by "tomorrow?"  Was "tomorrow" a reference to the day after the letter was postmarked or the day after the letter was received?  Where were the funds to be delivered?  In cross examining Detective Hoover, Mr. Brown was able to establish that there were several men's bathrooms in the area of Druid Hill Park.  Exactly where in the bathroom was the money to be left? In a stall?  Under a sink?  In a trash can?  Mr. Brown's cross examination clearly was calculated to show that the author of the letter did not actually intend to receive any money.[9]

It was for Mr. Brown to decide which witnesses to cross examine and what information to elicit from them.  He was not required to question every witness.  Indeed, it

---

[9]     These are but a few examples of Mr. Brown's strategic cross examination of several State's witnesses.

16

would have been folly to inquire of witnesses who could not provide beneficial information. *See State v. Borchardt*, 396 Md. 586, 615 (2007).

Contrary to Mr. Abeokuto's bald, unsupported assertions, this Court finds that Mr. Brown developed a clear and reasonable strategy for defending his client and, moreover, appropriately followed through with that strategy. Mr. Aeokuto has failed to establish that Mr. Brown's representation in this regard was in any way deficient.[10]

Mr. Abeokuto also contends that Trial Counsel "knew the State's witness[es] [were] in the courtroom [during] the entire trial (victim's parents) and failed to object." According to Mr. Abeokuto, Marciana's mother "made a loud outburst at [him]," which caused Judge Bollinger to admonish those in attendance to control their emotions or step out of the courtroom. Petitioner claims to have suffered prejudice as a result of the outburst.

The record reflects that, on August 23, 2004, before any testimony was taken, Mr. Brown sought to have the witnesses sequestered. 8/23 Tr. at 2. Judge Bollinger ordered that "[a]ll who are going to testify in this case kindly step outside and remain outside until you are called to testify. Please do not discuss your testimony with anyone." *Id*.

Marciana's parents were the second and third witnesses called to testify.[11] It is unclear from the record whether they were present in the courtroom prior to their testimony. At some point during Mr. Ringo's testimony, however, Judge Bollinger noticed Ms. White in the courtroom. Judge Bollinger asked the prosecutor whether he had "any intention of

---

[10]    Mr. Abeokuto failed to raise specific complaints or suggest what inquiries should have been made. He also failed to address how any perceived errors prejudiced his defense.

[11]    Officer Joseph Petrysak was the first witness called. He identified several photographs and oriented the Court with respect to the location of Marciana's apartment and her school, matters that were not in dispute. He also identified Mr. Abeokuto, another matter not in dispute. The officer also discussed his conversation with Mr. Abeokuto.

recalling Ms. White." 8/23 Tr. at 158. Mr. Brown interjected that the issue had been discussed, and he had "no problems with her being in" court. *Id.* Neither Ms. White nor Mr. Ringo was recalled.

During the State's closing argument, the prosecutor discussed the severity of the injuries inflicted upon Marciana. Specifically, the State directed the Court's attention to the injuries on her neck, saying that "if you look at the injuries to the neck, there [are] seven slashing wounds to the neck and there's the one main wound . . . ." August 27, 2004, transcript of proceedings ("8/27 Tr.") at 90. When she heard the description of the injuries, Ms. White called out "Jesus. Damn. Bitch." *Id.* at 91. Judge Bollinger then warned all in attendance that, if they could not control their emotions during the argument, they should "step outside the courtroom." *Id.*

Maryland Rule 5-615 provides for the exclusion of witnesses from the courtroom by court order "so that they cannot hear the testimony of other witnesses.... The court may continue the exclusion of a witness following the testimony of that witness if a party represents that the witness is likely to be recalled to give further testimony." Md. Rule 5-615(a). That acknowledged, not all who testify are to be excluded from the courtroom during the trial. By way of example, a court "shall not exclude pursuant to [the] Rule... a victim of a crime . . ., including any representative of such a deceased... victim." Md. Rule 5-615(b).

As already mentioned, Officer Petrysak was the first witness called. Given the scope of the questions put to him and the answers he provided, there was no concern that the officer's testimony might taint that of either Ms. White or Mr. Ringo were they in the

18

courtroom at the time. The same can be said for the testimony of Ms. White. It would not have affected that of Mr. Ringo, in light of the questions asked. Moreover, as Marciana's parents, Ms. White and Mr. Ringo were entitled to be present for the entire trial. *See* Md. Rule 5-615(b). Finally, even if Mr. Abeokuto were able to prove that Mr. Brown rendered ineffective assistance in failing to object to Marciana's parents' presence in the courtroom, he has utterly failed to establish prejudice.[12]

Initially, Mr. Abeokuto raised a number of issues with respect to the testimony provided by Dr. Saadia Alizai. By way of example, he complained that she testified without having first been placed under oath. More specifically, he argued that Dr. Alizai "was not subject to the penalty of perjury or any other consequence for not telling the truth. . . ." He claimed that, "[h]ad the witness been sworn . . ., her testimony would have been different, she would have had to tell the truth and [he] would have been sent back to Perkins for a proper inpatient evaluation." According to Mr. Abeokuto, had he been evaluated inpatient, he would have "been found incompetent to stand trial . . . ." Mr. Abeokuto appears most upset that, in his opinion, "[i]t was never placed on the record at all as to why [P]erkins made the decision to change the evaluation from court ordered inpatient to outpatient."

As already mentioned, some of these claims have been waived.[13] Others have been withdrawn.[14] That acknowledged, at the end of the first day of the competency hearing, both Dr. Inouye and Dr. Stevenson had completed their testimony. Judge Bollinger was

---

[12]     There is no evidence to suggest that Ms. White's outburst during closing argument, when she heard the description of her daughter's injuries, had any bearing whatsoever on the outcome of the case.
[13]     *See* Fn 3.
[14]     *See* Fn 4.

trying to determine how many more witnesses would be called and whether the hearing could be concluded the following day.[15] Judge Bollinger indicated that, initially, he "was prepared to listen to Dr. Inouye and to Dr. Stevenson and render a decision" that day. Transcript of June 21, 2004, proceedings ("6/21 Tr.") at 178. Judge Bollinger concluded, however, that he "would be remiss and abdicating [his] own judicial responsibility . . . if [he did] not afford Dr. Waltos for the defense an opportunity to present evidence . . . ." *Id.* at 178-79. Judge Bollinger also mentioned that he was "concerned about the Order of Court that Mr. Abeokuto be transported to a facility . . . for in-patient evaluation." *Id.*

In response to Judge Bollinger's inquiry, the State offered to "get someone from Perkins by tomorrow to address the issue of the in-patient evaluation and what, what their procedures were and what they, why they made that decision." *Id.* at 181. Following additional discussion, the State again offered "to have somebody brought in from Perkins tomorrow to explain what's going on." *Id.* at 183. The conversation then moved on to who at Perkins would have the required information. *Id.* at 184.

Dr. Alizai was present in the courtroom and indicated that she and Dr. Kim-Lee would be able to provide relevant information. *Id.* at 185. In response to direct questions from Judge Bollinger regarding in-patient versus out-patient evaluations, Dr. Alizai offered that, "generally if it's an in-patient order most of the time someone is admitted because [their] hand is forced . . . . [T]here was a shortage of beds . . . but they did make a bed for

---

[15]     Ms. Bull, earlier in the day, had explained that Dr. Waltos required surgery and "would be unavailable for six to eight weeks." 8/16 Tr. at 3. She argued that "his observations, his impressions, his expertise [were] critical to have available to the Court in live testimony." *Id.* at 4. She told Judge Bollinger that the defense needed "Dr. Waltos's testimony to rebut the Perkins report." *Id.*

Mr. Abeokuto the day he came. There was that possibility that he would be admitted." *Id.*

According to Dr. Alizai, the "only reason a patient, a Defendant would be admitted would

be if there was doubt as to competency." *Id.* at 186.

Based on those discussions, the following day, Dr. Kim-Lee and Dr. Alizai both

testified under oath regarding competency evaluations performed at Perkins. According to

Dr. Kim-Lee,

> [t]ypically what happens, obviously we receive an order for an
> evaluation with a referral. We – I assign the case to an
> evaluator and the evaluation is completed. We routinely
> complete all our evaluations, regardless of whether they're
> competency to stand trial or criminal responsibility, on an out-
> patient basis. We do not admit the Defendant to the hospital or
> do the evaluations, in other words, as an in-patient, unless
> there's a concern about competency to stand trial or there's
> another concern, for example, about a diagnostic issue that
> requires further evaluation as an in-patient.

June 22, 2004, transcript of proceedings ("6/22 Tr.") at 6-7. Dr. Kim-Lee further explained

that, in Mr. Abeokuto's case,

> it was specified that he was to be evaluated as an in-patient. So
> as a result of that, we did, in this case what we do routinely
> with any other case when we receive such an order, we – Mr.
> Schwartz, my assistant, notified the Judge or I don't know
> particularly specifically who he spoke to but basically
> contacted them to inform them of our process and how we do
> things at Perkins. In other words, that we do all evaluations on
> an out-patient basis and only admit if there is a need.

*Id.* at 8. In addition, Dr. Kim-Lee testified that she also spoke with Judge Bollinger's

assistant, Angela, regarding the issue. *Id.* Judge Bollinger interjected, "that the

information given to [him] was that they would do an evaluation to determine whether or

not they would need further in-patient care to complete the evaluation, but if they did the

initial evaluation and deemed that that was sufficient, that would be the way they were going to go, to which [he] said, that's the way they do it, that's the way they do it." *Id.* at 9. Dr. Kim-Lee confirmed that she provided the information to both the State and defense. *Id.* Dr. Kim-Lee also confirmed that Mr. Abeokuto's evaluation "was handled like any other case and . . . because there was not a concern about competency or a diagnostic concern that warranted further evaluation as an in-patient, this Defendant was handled as any other Defendant at Perkins and was not admitted to the hospital." *Id.* at 11-12.

Mr. Abeokuto is correct that Dr. Alizai was not under oath when she responded to Judge Bollinger's logistical questions posed at the end of the day on June 21, 2004. It is clear, however, that she was not testifying at the time. It is also clear that any complaint with respect to that discussion has been waived, and that Mr. Abeokuto has not established prejudice. Moreover, contrary to Mr. Abeokuto's assertions, Dr. Inouye and Dr. Kim-Lee both provided credible testimony delineating why the evaluation was performed on an out-patient basis. Finally, to the extent that Mr. Abeokuto suggests that Ms. Bull and Mr. MacDonnell should have objected to the June 21, 2004, end of the day colloquy, he is incorrect. Mr. Abeokuto has failed to establish ineffective assistance of counsel. He has failed to establish prejudice.

Mr. Abeokuto's next contention is that Trial Counsel was ineffective in that he "called none of the witnesses that were already prepared and ready to go by the previous attorneys," thereby prejudicing Petitioner's defense. Mr. Abeokuto, however, does not identify the witnesses or the beneficial information they were ready to impart. Again, Petitioner has failed to establish that Mr. Brown provided ineffective assistance.

Mr. Abeokuto next asserts that Mr. Brown failed to pursue and adequately discuss

with him an NCR defense. This suggestion ignores completely Mr. Brown's significant

history with Petitioner and the convincing testimony of Dr. Inouye, Dr. Alezai, and Dr.

Coleman. As Mr. Brown made clear during his hearing testimony, he was personally

acquainted with Mr. Abeokuto long before Marciana Ringo's death. Indeed, Mr. Brown

and Petitioner first met when Mr. Abeokuto was just a child. The two spent a considerable

amount of time together over the years. More specifically, Mr. Brown hired Mr. Abeokuto

to work in Mr. Brown's law office and, on occasion, had Petitioner to his home. Moreover,

Mr. Brown represented Mr. Abeokuto in a federal matter related to the same incident and

had worked closely with him. When specifically asked about an NCR defense, Mr. Brown

explained his reasoning as follows:

> I was working with what he had told me had occurred before
> his arrest. What he told me had occurred, and so you know,
> those things, and knowing him, and listening to him, and
> hearing his reasoning, and his plans even as he was being
> investigated, there was no question in my mind that yes, if you
> want to call someone to do something like that of sound mind,
> he was of sound mind.

AR 10:07:58 a.m. – 10:08:15 a.m.

When pressed on the issue, Mr. Brown elaborated:

> [keep] in mind that this was not in a vacuum. In other words,
> they didn't know him, they just met him, he's facing the death
> penalty, I got it, no question about it, leave no stone unturned.
> You have to understand, he was a kid when I first met him, and
> there had been a lot of time with him, discussions about all of
> this, so to me [not criminally responsible] wasn't an issue. I
> can understand how someone not knowing him, having this
> case, looking for a way out, trying to work him through all of

> this would want to engrain the no stone unturned and have him
> evaluated.

AR at 10:08:53 a.m. - 10:10.09 a.m.

In a nutshell, Mr. Brown testified that "you don't really have to be a weatherman to know which way the wind is blowing. You know enough about human nature, the NCRs, and competency, they stand out. They jump out at you." AR at 10:16:55 a.m. – 10:17:00 a.m.

Moreover, the many healthcare providers who interacted with Mr. Abeokuto failed to raise any concerns regarding his competency. For instance, Dr. Inouye testified that he "really didn't have difficulty obtaining information" for Mr. Abeokuto. 6/21 Tr. at 25. Indeed, he "found Mr. Abeokuto to be a cooperative Defendant." *Id.* Dr. Inouye noted that, according to Mr. Abeokuto, "he had never been treated for a psychiatric illness. He never received psychiatric treatment. And had never, in fact, received [a] psychiatric diagnosis." *Id.* at 25-26. When specifically asked, Mr. Abeokuto told Dr. Inouye that he had felt "down" when he was detained at the Harford County Detention Center "because he missed his mother and father." *Id.* at 26. Mr. Abeokuto indicated "that he had begun to experience anxiety after he arrived at the Baltimore County Detention Center. That he had not really felt anxious when he was at the Harford County Detention Center. And he related . . . feeling stressed and feeling anxious." *Id.*

Dr. Inouye opined, to a reasonable degree of medical certainty, that Mr. Abeokuto "ha[d] the capacity to understand the nature and object of the proceedings against him. And ha[d] the capacity to assist his attorney in his defense." *Id.* at 30. Dr. Inouye diagnosed

24

Mr. Abeokuto with adjustment disorder, "with mixed anxiety and depressed mood." *Id.* at 30-31. Importantly, Dr. Inouye also opined that Mr. Abeokuto was malingering. This was based on Mr. Abeokuto's report of "an image of a shiny red devil that would sit or stand behind him." *Id.* at 29, 34, 35. In Dr. Inouye's opinion, "Mr. Abeokuto's report of this devil, or this hallucination was variable in nature. And the fact that it occurred in this legal setting in his evaluation for competency to stand trial caused [him] to believe that in fact he was malingering." *Id.* at 35.

Dr. Inouye found additional support that Mr. Abeokuto was malingering in Petitioner's report "that he had awoken one morning at the Baltimore County Detention Center and found feces in his hand." *Id.* at 36. According to Dr. Inouye, "the only psychiatric diagnosis that . . . could possibly meet this experience that Mr. Abeokuto report[ed] [was] sleepwalking." *Id.* at 37. Dr. Inouye found unlikely that, while sleepwalking, Mr. Abeokuto could "somehow neatly defecate into his hand . . . [g]et back into his clothing. Get back into bed without getting fecal material on anything else. Then wake to find it in his hand." *Id.* at 37-38.

Dr. Coleman, the Director of the Mental Health Services for the Baltimore County Detention Center, testified that "[t]here was some incongruency between what [he] saw objectively and what the client was reporting to [him]." 6/22 Tr. at 20. According to Dr. Coleman, "there were no symptoms that were consistent with what [Mr. Abeokuto] was reporting to [him]." *Id.* at 21. Dr. Coleman was concerned that Mr. Abeokuto was embellishing his symptoms. *Id.* Importantly, according to Dr. Coleman, it was described to him that Mr. Abeokuto was "talking on the telephone, . . . laughing, . . . show[ing] no

signs of depression, no signs of psychosis, so he show[ed] no acute symptoms in that period of time . . . and . . . that was discussed with him on several occasions." *Id.* at 57.

Dr. Alizai observed Mr. Abeokuto in the courtroom during the competency hearing. She noted that "he occasionally put his head in this hand but was looking around, appeared to interact to some degree with his mother, he turned around, acknowledged her presence and was looking around the courtroom." 6/22 Tr. at 75. According to Dr. Alizai, Mr. Abeokuto appeared to "be making eye contact with the person testifying, paying attention to the Court proceedings." *Id.* Dr. Alizai compared this to the afternoon proceedings when Mr. Abeokuto knew that he was being watched. "The general content of the proceedings had . . . been similar throughout but when he knew he was being observed directly by Dr. Stevenson, he appeared to be . . . embellishing somewhat, holding his head down more. According to Dr. Alizai, when Mr. Abeokuto "knew that he was being watched directly, he appeared to be more dramatic . . . ." *Id.* at 75-76.

Dr. Alizai commented that, when she saw Mr. Abeokuto at Perkins, his behavior was nothing like that described by Dr. Stevenson. According to Dr. Alizai, Mr. Abeokuto answered . . . questions appropriately and thoroughly, and when it was time to move on to a different topic, he moved on." *Id.* at 80. Dr. Alizai opined, to a reasonable degree of medical certainty, that Mr. Abeokuto's "behavior in Court [was] further malingering. He [was] dramatizing his actions. He [was] trying to make it clear to the Court that he [was] suffering and that he [was] not competent. The goal would be to put off the proceedings." *Id.* at 90-91.

26

Even Dr. Stevenson, a psychologist retained by the defense to assist with mitigation,

who spent more than 25 hours with Mr. Abeokuto, failed to "raise any alarm . . . to defense

counsel that [Mr. Abeokuto] was not competent to stand trial." *Id.* at 118, 121, 122, 152.

With his personal knowledge of Petitioner, Trial Counsel was unsurprised by the

findings of the health care providers. When Mr. Brown was asked about the findings, he

vividly remembered the doctors having concluded that Petitioner was malingering, or

purposely producing falsely exaggerating psychological symptoms with the goal of being

rendered incompetent.

> [STATE]: You also recall that in the course of the competency
> hearing there was a finding by the doctors at Clifton T. Perkins
> that he had been --
>
> [TRIAL COUNSEL]: Malingering, I do remember that.
>
> [STATE]: -- malingering, and that diagnosis is basically,
> would have been a factor to consider in pursuing the criminal
> responsibility issue.
>
> [TRIAL COUNSEL]: Yes, it would, but it paled in comparison
> to the value in my mind of my experience with him and my
> knowledge of him and familiarity with him.

AR at 10:15:26 a.m. – 10:16:05 a.m.

As pointed out by Mr. Abeokuto, generally, "counsel has a duty to make reasonable

investigations or to make a reasonable decision that makes particular investigations

unnecessary." *Strickland*, 466 U.S. at 690-91. But, "when a defendant has given counsel

reason to believe that pursuing certain investigations would be fruitless . . . , counsel's

failure to pursue those investigations may not later be challenged as unreasonable." *Id.* In

this instance, Mr. Abeokuto has failed to establish that Mr. Brown's representation was deficient. He has failed to establish prejudice.

Mr. Abeokuto next complains that Mr. Brown "prejudice[d] [his] defense by turning over all of [Petitioner's] work product for NCR to the State without [his] permission or [his] knowledge." Mr. Abeokuto fails to identify, with any specificity, what information was turned over to the State and specifically how that information prejudiced his defense.

Petitioner next asserts that Mr. Brown "did not prepare for the competency issue" that his public defenders were litigating. According to Mr. Abeokuto, "[h]ad [Mr. Brown] prepared for the competency hearing and contacted the already retained experts there was a strong possibility [Petitioner] would have been found incompetent to stand trial."

The competency hearing was scheduled for June 21-22, 2004. At that time, Mr. Abeokuto was represented by Amanda Bull and Eric MacDonnell. Over the course of those two days, Judge Bollinger heard testimony from Dr. Inouye, Dr. Stevenson, Dr. Kim-Lee, Dr. Coleman, and Dr. Alizai. At the request of the defense, Judge Bollinger continued the hearing until August 16, 2004, when Dr. Waltos could be available.

Dr. Waltos testified that he saw Mr. Abeokuto on an emergent basis, at the request of Ms. Bull and Mr. MacDonnell. According to Dr. Waltos, Mr. Abeokuto's "attorneys came down and expressed concern that he wasn't very responsive during the jury selection process, and the question was raised as to whether or not he was able to sufficiently cooperate with his counsel." 8/16 Tr. at 4. As a result of the attorneys' concerns, Dr. Waltos evaluated Petitioner, spending approximately 15 or 20 minutes with him. Id. As a result of his interaction with Petitioner, Dr. Waltos had "some concern about [Mr.

Abeokuto's] ability to cooperate at that time." *Id.* Dr. Waltos went on to testify, however, that he had no opinion as to whether Mr. Abeokuto, in fact, suffers from a dissociative disorder. *Id.* Dr. Waltos made clear that he was not in a position to opine, to any degree of medical certainty, whether Mr. Abeokuto was competent either at the time of the emergent evaluation or at the time of the August 16, 2004, hearing. *Id.* at 5.

Mr. Brown told Judge Bollinger that he had reviewed the transcript of the June hearings, that his client was still hearing voices, and that he otherwise would submit. Judge Bollinger determined that Mr. Abeokuto was competent.

Petitioner has failed to establish that Mr. Brown provided ineffective assistance. Moreover, Mr. Abeokuto has failed to establish prejudice.

## CONCLUSION

"It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland*, 466 U.S. at 689. Therefore, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* In this case, Mr. Brown's strategy was sound. Petitioner has failed to establish that his attorney's representation was in any way deficient. Similarly, he has failed to establish prejudice. Therefore, for all of

| | | |
|---|---|---|
| JAMAAL K. ABEOKUTO | * | IN THE |
| Petitioner | * | CIRCUIT COURT |
| v. | * | FOR |
| STATE OF MARYLAND | * | BALTIMORE COUNTY |
| Respondent | * | Case No. 03-K-03--2127 |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## ORDER

Having read and considered the Petition for Post Conviction Relief, the State's Answer and Memorandum in Support, the Post-Hearing Supplement, and the relevant transcripts, and having considered the testimony provided, the arguments presented by counsel, and the relevant law, it is this ___ day of April 2020, hereby ORDERED that the Petition for Post Conviction Relief is DENIED in its entirety.

JUDITH C. ENSOR, Judge

Entered: Clerk, Circuit Court for
Baltimore County, MD
April 13, 2020

## cc:  SAO, Defense Atty, Defendant

E-FILED
Court of Special Appeals
Gregory Hilton
5/25/2021 8:49 AM

Circuit Court for Baltimore County
Case No. 03-K-03-002127

UNREPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 279

September Term, 2020

---

POST-CONVICTION

---

JAMAAL ABEOKUTO

v.

STATE OF MARYLAND

---

Kehoe,
Berger,
Wright, Alexander
  (Senior Judge, Specially Assigned),

JJ.

---

PER CURIAM

---

Filed: May 25, 2021

AO 241
(Rev. 01/15)

Page 8

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have

used to exhaust your state remedies on Ground One: _____

_____

_____

**GROUND TWO:** Mr. Brown failed to pursue my defense of NCR despite

my request and prepared research

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

On the frest day of trial I asked Mr. Brown to go with the NCR

defense. He told me "We con not use that", and mention beating the case

by techincality, I trust his word as my former boss and attorney. He later

States at post conviction. I never asked him that; that would have

been absurd.

_____

_____

(b) If you did not exhaust your state remedies on Ground Two, explain why: _____

_____

_____

(c)    **Direct Appeal of Ground Two:**

(1) If you appealed from the judgment of conviction, did you raise this issue?        ☐ Yes    ☑ No

(2) If you did <u>not</u> raise this issue in your direct appeal, explain why:    Post issue - ineffective

_____

(d)    **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☑ Yes    ☐ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition:    Post Conviction

Name and location of the court where the motion or petition was filed:    Baltimore county Circuit

Court.

_____

Docket or case number (if you know):    03-K-03-002127

Date of the court's decision:    4-9-2020

Result (attach a copy of the court's opinion or order, if available): _Attached._

_____

(3) Did you receive a hearing on your motion or petition?          ☑ Yes    ☐ No

(4) Did you appeal from the denial of your motion or petition?          ☑ Yes    ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?          ☑ Yes    ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _Court of Special Appeal of_

_Maryland._

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

_____

_____

_____

(e)    **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you

have used to exhaust your state remedies on Ground Two : _____

_____

_____

**GROUND THREE:**    _MR Brown put the States case to no adversial testing_
_He hardly cross examine any witnesses of the State at all and had no defense_

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

_MR. Brown State to the court when he asked to postpone the trial. He wanted to_
_test DNA, contact expert witnesses. He did none of it. He challenged none of_
_the experts and hardly cross examine witnesses for contradictions. He put on one_
_Character witness as a defense and submitted (who was my mom). He later_
_did the same at my competency hearing. He found me competent himself; submitted_
_without experts and went forward. I make me feel he was just trying to get the_
_case over with. which_

AO 241
(Rev. 01/15)

(b) If you did not exhaust your state remedies on Ground Three, explain why: _____

_____

_____

_____

(c)   **Direct Appeal of Ground Three:**

(1) If you appealed from the judgment of conviction, did you raise this issue?   ☐ Yes   ☑ No

(2) If you did not raise this issue in your direct appeal, explain why:   _post issue - ineffective_

_____

(d)   **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☑ Yes   ☐ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition:   _Post Conviction_

Name and location of the court where the motion or petition was filed:   _Baltimore count_
_Crecoit Court_

Docket or case number (if you know):   _03 - K - 03 - 002127_

Date of the court's decision:   _4-9-2020_

Result (attach a copy of the court's opinion or order, if available):   _Previously Attached_

_____

(3) Did you receive a hearing on your motion or petition?   ☑ Yes   ☐ No

(4) Did you appeal from the denial of your motion or petition?   ☑ Yes   ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?   ☑ Yes   ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed:   _Court of Special Appeals of_
_Maryland._

Docket or case number (if you know):   _____

Date of the court's decision:   _____

Result (attach a copy of the court's opinion or order, if available):   _____

_____

AO 241
(Rev. 01/15)

Page 11

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

_____

_____

(e)  **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Three:

_____

**GROUND FOUR:** MR Brown prejudice my defense by turning over all my work product for NCR to the State without my permission or knowledge

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

MR. Brown failed to use this material despite my request for NCR. The States witnesses later change there testimony to fit what I said to my experts So it would no longer be a defense. (the victims mother). The law also protects me from self-incrimination. In this paper work I odmit to the offense to my defense team in essence the State called in a expert to interview me. who testifed against me.

_____

_____

(b) If you did not exhaust your state remedies on Ground Four, explain why:  _____

_____

_____

_____

(c)  **Direct Appeal of Ground Four:**

(1) If you appealed from the judgment of conviction, did you raise this issue?   ☐ Yes   ☑ No

(2) If you did not raise this issue in your direct appeal, explain why:  post issue - ineffective

(d)  **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☑ Yes   ☐ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition:  post conviction petition

AO 241
(Rev. 01/15)

Page 12

Name and location of the court where the motion or petition was filed:   Baltimore. County

Circuit Court.

Docket or case number (if you know):   03-K-03-002127

Date of the court's decision:   4-9-2020

Result (attach a copy of the court's opinion or order, if available):   Previosly Attached.

(3) Did you receive a hearing on your motion or petition?   ☑ Yes   ☐ No

(4) Did you appeal from the denial of your motion or petition?   ☑ Yes   ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?   ☑ Yes   ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed:   Court of Special Appeals of Maryland

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

_____

(e)   **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Four:

_____

Attachments for Further Grounds

Ground Five: The post conviction court erred in withdrawing issues because in open court Judge Enson stated she would not allow my attorney Micheal Lawlor to withdraw any.

The court states my allegations were withdrawn therefore, not addressed when the Judge stated she would not withdraw the because for some reason it would be unfair. I was ok to keep all the issue because my trial counsel told me he had prepared and filed a supplement to my petition but the Judge told me he never did that. It was not there So, I was ok to keep the issues, It would preserve them, She withdrew issues 3, 7, 10, 11 and the issue on - the Jury being inpartial and the court ordered evoluation violation. it looks like seven issues total.

Ground Six: I was denied my constitutional guarenteed right to effective assistance of counsel in the totality of the circumstances when mr Brown failed to investigate and present substantial mitigating evidence during sentencing phase of my capital murder trial with evidence already prepared.

In the totality of the circumstances MR Brown was ineffective because in the postponement attempt. he wanted to test DNA & contract expert witnesses per his request. But did not do so once postponement denied although he had time to contact experts and thy trying to reach him

Ground Seven: MR Brown had never tried a death penalty case before and was allotted 2 weeks to prepare because of denied postponement.

MR. Brown in the beginning told my family he had death penalty exp. Amanda Bull told me he didn't but, I failed to believe her. Warren Brown testified at post conviction he had no experience. He lied to me and my family the entire time. He took our money and we didn't finish paying him until and upon to my new sentencing hearing in 2007.

Ground Eight: MR Brown called none of the witnesses that were already prepared and ready by previous attorneys. this performance prejudice my defense.

MR Brown contacted None of the expert witnesses who were prepared for this case Nor any lay witness but my mom as one character witness.

Ground Nine: MR Brown failed to adequately investigate and present evidence in mitigation of guilt. MR Brown's performance fell below an objective standard of reasonableness, thus prejudicing my defense of NCR.

MR. Brown did nothing to prepare my defense, made no attempt to pick up where the public defender left off in any situation and Brush me off regarding my NCR which I learned about through my defense team psychologist by saying "we can't use that". So I knew nothing else to say this was the day of the trial.

Ground Ten: Mr. Brown did not prepare for the competency issue that Ms Bell & Ms McDonnell were litigating. He did

Mr. Brown Did not contact the mental Health experts that were already retained by previous counsel and retained none of his own. He did not contact the Examining psychiatrist Dr. Seibert Nor psychologist Stevenson. Had he contacted the experts there is a possibility I would have been found incompetent. Thus predudicing my defense and forcing me to go forward. Finding me competent himself and submitting to the case.

Ground Eleven: The record Reflects that upon the Judge having a conversation with my attorney and the State, Dr. Alizai interjects and begins to testify without being Sworn in.

Dr. Alizai along with her coworker Dr Ingore both work at Clifton T. Perllins with the victims great grandmother. My Attorney and the Judge was made aware. Dr. Alizai injects herself into a conversation to testify against me. She shows her intent to say her point and make it known. She was not placed under oath but expressed her complete and bias view against me.

Ground Twelve: I was denied my right to a fair trial by the due process Clause of the fourteenth Amendment.

My Right to assistance of counsel was damaged when all my work product was turned over to the State by Mr. Brown. It communicated all I talk to my expert witnesses about and he had no intention on using them. Thus, the victims mother change her testimony So what I said wouldn't be a defense. It would Sound reasonable.

Ground Thirteen: The Court order for inpatient evaluation was violated because proper procedure was not kept for mental Heath evaluation.

Clifton T. Perkins violated my rights by changing my court ordered inpatient evaluation to out patient and sending me back to the County Jail in about 1-2 hours. The victims family had been working at this Hospital as a nurse for at least 2 years at this point. My evaluation was not fair despite how I was intentional sabotage by their officials.

Ground Fourteen: [was raised on direct appeal]; [was not raised on post conviction - it was my belief this issue was finally litigated in the state court] (issue The issue from fourteen forward pertain to these statements about direct appeal and post conviction.)
: The trial court erred in determining that I waived my Consitutional right to a trial by Jury at guilt and innocence phase was knowing & voluntary.

My mental heath was in question and the totality of the circumstances was in edequate to ensure I knowingly waived my right to Jury trial, With Dr Seibert report attached. There is absolutely no support in the record to say this waiver was voluntary.

Ground Fifteen: The trial court erred in admitting Evidence of my Post Arrest, post-Miranda Warning Silence.

Special Agent Scott Keller mentions my choice to remain silent and held it against me in his testimony and was damaging.

Ground Sixteen: The trial court erred in denying my request for postponement to prepare New counsel to prepare for trial & sentencing.

This was not a regular trial. I was on trial for my life and all procussions should have been taken to ensure I recieve a fair trial.

Ground seventeen: The trial court erred when it denied my motion to suppress my statement at Homicide unit because my firth Amendment right against compelled self-incrimination was violated when detectives interrogated me without giving me miranda warnings

There is no evidence in the record to support the detectives ever giving me a miranda but, the statements and records were allowed as evidence desipte custodal evidence

Ground Eighteen: The court erred when it denied my motion to suppress the clothes that the detectives removed from me during my detention at the homicide unit

While at homicide I was told to remove my clothes and empty my pockets. So I did So. I followed orders and this was involuntary.

Ground nineteen: The court erroed in admitting Evidence of a handgun recovered from my car.

The handgun had nothing to do with the case and was use against me in the case to say I was dangerous.

Ground Twenty: The Cumlative effect of the Errors set forth herein deprived me of a fair trial and/or a fair sentencing hearing

With the totdlity of these errors there is no reason to believe that Warren Brown represented me in a fair trial.

Ground Twenty-one: The indictment failede to allege principalship and the aggravating Circumstances depere me of the common law right to a probable Cause finding to prosecution for a serious offense.

The death penalty and this being capital murder was founded upon reason of a intimidating power or by malice or by persend ill will do to not being a member of the underlined community.

Cant where Filed: Court of Appeals in maryland

Cost# 03-K-03-002127

Jamaal Abeollute

323-969

1780656

Attachment for Further Grounds - additional page

Ground twenty-two:
  The State did not reach it's burden of proof in determining premeditated first degree murder.


  The prosecution based it's case in determining premeditation on the testimony of Thedrick Theodore Tapp and him getting my time card from me on December 2, 2002 and then punching me into award the morning of the offense, December 3, 2002 as premeditation. They did this as if the events were planned the day before which would have been December 2, 2002. Yet, Mr. Tapp testified himself that because I was late to work he took it upon himself to punch me in that morning of his own will and accord. He was never asked by me to do that. He had no idea if I would show up for work that day or not. Do to unforseen events, I was unable to meet him at the time clock to get my time card back from him. Unfortantly, I was in the midst of a psychological/mental breakdown that morning of no control of my own. He could have just not punched me in and given me my time card to punch in when I got there because I may not have come in that day for any reason. This proves these events were not premeditated. My trial counsel never questioned his credibility. This man was not credible. He was helping me steal time as he has done. He already had knowledge of the case and presisted on talking to the police with numerous calls to them. The fact he said that I said "I had something to do was not questioned". Yet, it was also I was running late. It was the States theory everything happen before I got to work - which was wrong. Tapp's testimony proves no premeditation. Therefore, this conviction should be overturned and my post conviction counsel deamed ineffective for not raising all the issues. I asked him and not doing the supplement he told me he did. (See Attached transcript. Aug 24, 2002 Pg 16-22)

                                                    Jamaal Absolута 323-869-1880656

11

1  you saw him periodically as you all were doing your
2  daily tasks, is that correct?
3     A.   Yes.
4     Q.   And is this warehouse a very big warehouse?
5     A.   Yes.
6     Q.   And, you know, how often did you see him
7  throughout that three and a half hour period do you
8  think?
9     A.   Maybe two times.
10    Q.   And was he dressed in the, the uniform that
11 you all are to wear there or the clothing you that you
12 required to wear?
13    A.   Yes.
14    Q.   Did you ever see him leave during that period
15 of time?
16    A.   No.
17    Q.   Are you all able to leave or -- without
18 swiping your card or if you leave you have got to swipe
19 your card?
20    A.   You can leave without swiping your card.
21    Q.   Okay. And swiping the card was something that
22 you all sometimes did, you weren't supposed to do but
23 all sometimes did for each other, is that correct?
24    A.   Yes.
25    Q.   Okay. I mean not just you and Jamaal but

10

1  other individuals who worked on your team, for example,
2  is that correct?
3     A.   Yes.
4     Q.   All right. I have no further questions.
5  Thank you, sir.
6          THE COURT: Any redirect?
7          MR. LEWIS: Yes, Your Honor.
8              REDIRECT EXAMINATION
9  BY MR. LEWIS:
10    Q.   Where do you do your selecting at, that's a
11 freezer, basically a large freezer warehouse.
12    A.   Yes.
13    Q.   How many clocks are kept in the freezer
14 section of the warehouse?
15    A.   In the freezer's parts -- there's no clocks in
16 the freezer.
17    Q.   How sure are you as far as the time of 8:20 to
18 8:30 when you saw him?
19    A.   That was just an estimated guess.
20         MR. LEWIS: That's all the questions I have,
21 Your Honor.
22         THE COURT: Any recross?
23         MR. BROWN: Yes.
24             RECROSS EXAMINATION
25 BY MR. BROWN:

1     A.   You got there, you know what time you got
2  there though, right, that morning. It was around
3  7 o'clock.
4     Q.   7 o'clock. Is that the time you are supposed
5  to be there?
6     A.   Yes.
7     Q.   And you swiped in?
8     A.   Yes.
9     Q.   And as far as you know you were on time that
10 day?
11    A.   Yes.
12    Q.   Okay. And so it is safe to stay about an hour
13 and a half passed before you first saw Jamaal?
14    A.   I assume. It's no clocks in there so --
15    Q.   I understand. Well, just in terms of your
16 ability to measure time --
17    A.   Yes.
18    Q.   -- would it be safe to say when you told the
19 police the very day they took you down on December the
20 3rd or December the 4th?
21    A.   December --
22    Q.   Let me help you. December the 4th?
23    A.   Right.
24    Q.   The day after, so you were recollecting what
25 happened just within 24 hours, right?

12

1     A.   Yes.
2     Q.   And so when you told them that it was 8:20 to
3  8:30, within 24 hours of this event you told them it
4  was about 8:20 or 8:30? Would you say that was pretty
5  accurate?
6     A.   No.
7     Q.   What would you say would be accurate?
8     A.   About -- I don't know.
9     Q.   You don't know?
10    A.   No.
11    Q.   Are you sure you even swiped his card?
12    A.   Yeah, I swiped his card.
13    Q.   All right. Well, I don't -- did you ever
14 tell them you weren't sure or did you tell them that it
15 was 8:20 to 8:30 that you first saw him?
16    A.   I told them it was around 8:20, 8:30.
17    Q.   Why did you tell them that?
18    A.   Because that's what I assume it was.
19    Q.   Okay. Why are you assuming it wasn't that
20 now?
21    A.   I don't know. Cross examining me.
22         THE COURT: I didn't hear that.
23         THE WITNESS: I -- repeat.
24    Q.   All right. Back then you admit, the day after
25 you admit that you told them 8:20, 8:30 is when I first

17

```
1      MR. BROWN: None.
2      THE COURT: So admitted.
3      (Whereupon, so marked.)
4   BY MR. LEWIS:
5      Q.  How many times after lunch time did you see
6   the Defendant on December 2nd?
7      A.  None.
8      Q.  And what time did you swipe him out?
9      A.  Like around 5:30.
10     Q.  Now, how were you supposed to get his time
11  card back to him?
12     A.  I was supposed to give it back to him at the
13  next morning around 8 o'clock.
14     Q.  That would be on December 3rd, 2002?
15     A.  Yes, sir.
16     Q.  And what time did you arrive at work on --
17     A.  Around 6:45.
18     Q.  And did you go out to the time clock around
19  8 o'clock?
20     A.  Yeah. Yes, sir.
21     Q.  What, if anything, did you see when you went
22  out to the time clock?
23     A.  I didn't see anyone out there.
24     Q.  Did you see the Defendant?
25     A.  No, sir.
```

18

```
1      Q.  What did you do after you went out to the time
2   clock and you didn't see the Defendant?
3      A.  I went back inside and started working for a
4   little bit more.
5      Q.  About how much longer did you work inside the
6   warehouse?
7      A.  Maybe like fifteen more minutes.
8      Q.  Then what did you do?
9      A.  I came back out.
10     Q.  And when you came back out of the warehouse,
11  what did you do then?
12     A.  I then swiped him in because I didn't see him
13  and I couldn't continue to run back and forth because
14  we had trucks that needed to be loaded up.
15     Q.  About what time did you swipe him in?
16     A.  Around 8:15, 8:30.
17     Q.  Now, did there come a time that day that you
18  saw the Defendant?
19     A.  Yes.
20     Q.  And about how long after you swiped him in did
21  you see the Defendant?
22     A.  It was like forty-five minutes or longer.
23     Q.  Where were you at when you saw the Defendant?
24     A.  I was in the freezer picking an order.
25     Q.  What happened while you were in there?
```

19

```
1      A.  He then came to me and I asked him wasn't he
2   supposed to be there at 8 o'clock and he said that he
3   was running a little late, that he had something to do.
4      Q.  Did you give him his time card back?
5      A.  Yes, I then gave him his time card back and
6   told him he didn't have to worry about punching hisself
7   in because I had punched hm in because I couldn't keep
8   on running back and forth.
9      Q.  How many more times that day did you see the
10  Defendant?
11     A.  I didn't see him any time after that.
12     Q.  When you worked back in the freezer again,
13  what's the temperature back there?
14     A.  Like zero below.
15     Q.  And as far as when you are working back there,
16  what type of clothing do you wear?
17     A.  Well, you wear like insulated pants, jacket,
18  insulated hood, gloves and steel towed boots.
19     Q.  Why do you wear steel towed boots?
20     A.  Because they keep -- like they have frozen
21  turkeys and bone marrow, that if it falls on your foot
22  it can crush your foot.
23     Q.  What requirement does the company have that
24  you wear steel towed boots?
25     A.  That you have to wear them.
```

20

```
1      Q.  Did the company issue any equipment?
2      A.  Yes. Like gloves.
3      Q.  How many pairs of gloves did they issue?
4      A.  They had two different colors. They had white
5   and green and you could kind of mix and match them
6   however you wanted to.
7      Q.  And when you wore the gloves, the white and
8   green, you said you would mix and match them. How many
9   pairs would you wear on your hands at any given time?
10     A.  Like two.
11     MR. LEWIS: Your Honor, may I approach?
12     THE COURT: You may.
13  BY MR. LEWIS:
14     Q.  Show you what has been marked for
15  identification as State's Exhibit 44. Ask if you can
16  identify any of the items in that photograph?
17     A.  The gloves.
18     Q.  How many pairs of gloves are in there?
19     A.  There's three pair.
20     Q.  And how do they compare to gloves that would
21  be issued by C&S Wholesale?
22     A.  Because one of them, they were so cold, one of
23  them is like an inner lining, one of them is out, three
24  pairs of inner lining and the white ones are the outer
25  lining but you can wear them out if you want.
```

AO 241
(Rev. 01/15)

13.   Please answer these additional questions about the petition you are filing:

     (a)   Have all grounds for relief that you have raised in this petition been presented to the highest state court

          having jurisdiction?   ☑ Yes      ☐   No

          If your answer is "No," state which grounds have not been so presented and give your reason(s) for not

          presenting them: _____

          _____

          _____

          _____

     (b)   Is there any ground in this petition that has not been presented in some state or federal court?  If so, which

          ground or grounds have not been presented, and state your reasons for not presenting them:

          _See Attachment! New discovered evidence (Report Attached by_

          _Dr. Siebert)_____

14.   Have you previously filed any type of petition, application, or motion in a federal court regarding the conviction

     that you challenge in this petition?      ☐   Yes   ☑ No

     If "Yes," state the name and  location of the court, the docket or case number, the type of proceeding, the issues

     raised, the date of the court's decision, and the result for each petition, application, or motion filed.  Attach a copy

     of any court opinion or order, if available. _____

     _____

     _____

     _____

     _____

     _____

     _____

15.   Do you have any petition or appeal now pending (filed and not decided yet) in any court, either state or federal, for

     the judgment you are challenging?      ☐   Yes   ☑ No

     If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues

     raised. _____

     _____

     _____

     _____

     _____

page 1

Attachment for #13 line b.

The issue I am presenting now is based on newly discovered evidence that was just discovered in November of 2020.:

Dr. Stephen W. Siebert, who's report is attached informed me upon contacting him for a copy of his report. I informed me that my previous trial attorney Amanda E. Ball Never asked him to do a NCR evaluation. This was to my surprise.

The Second chair Eric Mc donnell testified at my post conviction hearing that he didn't know what was taking so long. In my conversation with him over the year he was not sure what the diagnosis was he no longer had the paper work.

All this began with Dr. Janice Stevenson - pychologist who was seeing me before trial she stated to me I was close to a NCR but it all depended on Dr. Siebert. This was before I knew what a NCR was. So per my Appointment with miss Stevenson that day Amanda was to ask for a NCR Evaluation, which I know came to find out she Never did, she only asked for a presentence investigation. The entire time I'm being evaluated I believed it was for NCR and it wasn't. even After being Sentence to death. This is what Cause me to ask Warren Brown to go with the NCR when he took over the case

So, I basically went to trial with No evaluation (proper) because Mr. Brown Never contacted my experts who were already working.
(New discovered evidence)   Jamaal Abdul 378969

page2

Newly discovered evidence - additional supporting facts #13 Line b

Amanda Bull told me she had up until the first day of trial to file NCR. She told me not to talk to the detention center psych. doctors because she didn't want the State to know what she was doing.

Yet, she never filed or asked for the NCR evaluation as I talked to her about per the psychologist Janice Stevenson who stated to me I was close to it, it depended on Dr. Seibert. So the entire time I believed I was being evaluated for NCR but, that wasn't the case. I thought I didn't get the NCR because I had malingered Somethings; Therefore, they couldn't conclude the diagnosis because I had malingered Somethings and kept them from concluding. Dr. Seibert's report shows the opposite, she never asked for it and Dr. Seibert said so himself.

In light of this newly discovered evidence.: The petitioner is requesting a new trial.

Jamad Abeokuto
Jamad Abeokuto
303-969, 1780656

STEPHEN W. SIEBERT, M.D., M.P.H., P.A.
951 FELL STREET - SUITE 322
BALTIMORE, MARYLAND 21231

TELEPHONE: [410] 583—7885
FACSIMILE: [410] 583—8178
EMAIL: DRSIEBERT@MAC.COM

Amanda E. Bull
Deputy District Public Defender
Office Of The Public Defender
District Nine · Harford County
Mary E. W. Risteau District Court/MSC
2 South Bond Street
Bel Air, Maryland 21014

RE: State of Maryland v. Jamaal Abeokuto

At your request, I have conducted a comprehensive forensic psychiatric evaluation of Jamaal Abeokuto. He was initially interviewed in my office on 3/17/04 for 3 hours and he was subsequently at the Baltimore County Detention Center on 4/02/04, 6/04/04, 6/11/04, 6/18/04, and 6/21/04 for a total of 10 hours. More recently, I had the opportunity to interview Mr. Abeokuto at the Maryland Correctional Adjustment Center on 10/09/06 for 2 hours. I have discussed Mr. Abeokuto's history with Janice Stevenson PhD and Pam Taylor LCSW-C, the latter on 3/21/07. Finally, as part of my evaluation, I reviewed the following records:

*Medical Records of Lois Freeman*
  Greater Baltimore Medical Center, 12/17—12/23/79

*School Records*
  Owings Mills High School transcript, 1994/95—1997/98

*Employment Records*
  MetroOne, 2/12/02—5/29/02
  SYSCO, 6/20/02—8/14/02
  C & S Wholesale Grocers, 10/18/02—12/10/02

*Legal Records*
  Charge Summary and Statement of Charges, Case No. 0C00052661, 12/15/96
  Reverse Waiver Investigation, Case No. 97—CR—1028, 4/10/97
  State of Maryland vs. Jamaal Kenneth Abeokuto, Criminal Case No. K—03—0103
  Criminal Information, 1/30/03
  Office of the Chief Medical Examiner, Case No. 02—6944—025, Marciana M. Ringo, 1/30/03
  Indictment, 3/06/03
  Commitment Pending Hearing, 4/28/03
  Findings and Sentencing Determination
  Circuit Court for Baltimore County Transcripts, Case No. 03—CR—2127
        Competency, 6/21/04, 6/22/04, and 8/16/04
        Trial on Merits, 8/23—8/27/04
        Sentencing, 11/15/04

*Administrative and Mental Health Records*
  Wicomico County Detention Center, 1/14/03—4/18/03
  Harford County Detention Center, 4/28/03—3/29/04
  Medical Records, Baltimore County Bureau of Corrections, 3/29—6/18/04
  Mental Health Progress Notes, Dept of Public Safety and Correctional Services, 11/16—6/28/04

*Forensic Evaluations*
>Pretrial Evaluation for Competency to Stand Trial, David Waltos MD, 4/08/04
>Competency Evaluation, Clifton T. Perkins Hospital Center, Dean Inouye MD, 5/05/04
>Psychological Evaluation, Michael G. Sweda PhD, 11/02/04
>Gregory C. Fey MD, 11/08/04

*Other Records*
>Audiotape of statement of Jamaal Abeokuto, 12/04/02
>Miscellaneous discovery and criminal investigation material
>Handwritten notes of Jamaal Abeokuto, undated
>Interview notes of Lori James Monroe, 9/15/03–4/05/04
>Psychological testing results and "raw data," 10/21/04

Based on my history, review of records, and examination of Jamaal Abeokuto, and my knowledge, skill, experience, training, and education in Psychiatry, Child Psychiatry, and Forensic Psychiatry, I have the following opinions:[1]

1. Malingering is the intentional production of false or exaggerated symptoms for a specific purpose. It is specific to context. Evidence that an individual is malingering does not exclude the presence of an underlying mental disorder. For example, an individual with documented schizophrenic disorder can be malingering if they produce or exaggerate their symptoms in order to gain admission to a hospital.

2. There is clear evidence for a family history of major mental illness, paranoia, and idiosyncratic "cult-like" religious beliefs in multiple persons who raised Jamaal Abeokuto sufficient to induce a **shared psychotic disorder** (folie á deux).

3. Jamal Abeokuto has a history and evidence for paranoid personality traits beginning in childhood and adolescence that was manifested in different contexts by social anxiety, suspiciousness of others, pathological jealousy, perceived hidden meanings, and magical thinking sufficient to make a diagnosis of a **paranoid personality disorder**.

4. There is a history for a depressive episode prior to the criminal offense and evidence for a chronic **depressive disorder** subsequent to his arrest that has required treatment with antidepressant medications.

5. There is a clear history and evidence for the presence of nonbizarre delusions sufficient to warrant the diagnosis of a **delusional disorder, mixed type.** There is evidence at different times for religious, persecutory, jealous, and somatic delusional themes. Subsequent to his arrest, Mr. Abeokuto has been prescribed antipsychotic medications by more than one treating psychiatrist.

6. Based on the above mental disorders and impairments, the capacity of the Jamaal Abeokuto to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired as a result of mental incapacity, mental disorder, or emotional disturbance.

**Stephen W. Siebert, M.D., M.P.H.**
*Diplomate in the Specialty of Psychiatry, American Board of Psychiatry and Neurology*
*Diplomate in the Subspecialty of Forensic Psychiatry, American Board of Psychiatry and Neurology*
*Certified Independent Medical Examiner, American Board of Independent Medical Examiners*

---

[1] I have reached these conclusions with reasonable medical certainty. The opinions in this report are based on clinical assessment, examination, and documentation and rendered with a reasonable degree of medical certainty.

AO 241
(Rev. 01/15)

Page 14

16.   Give the name and address, if you know, of each attorney who represented you in the following stages of the

judgment you are challenging:

(a) At preliminary hearing:   Amanda E. Bull (Retired Public defender) Eric McDonnell

Public defender  2 South Bond St.  Belair, MD  21014   Harford County PD office

(b) At arraignment and plea:   Amanda E. Bull & Eric McDonnell  Public defenders

_____

(c) At trial:  ~~Amanda Bott~~ Warren A. Brown  711 St Paul St

Baltimore, MD 21202

(d) At sentencing:   Warren A. Brown  711 St Paul St.

Baltimore, MD 21202

(e) On appeal:   Micheal Broudes  - Collateral Review Appelate

Division

(f) In any post-conviction proceeding:   Micheal Lawlor  6305 Baltimore Ave  Ivy lane

~~Suite 204~~ Greenbelt, MD  20770   Suite 700

(g) On appeal from any ruling against you in a post-conviction proceeding:   Pro-se - COSA

_____

_____

17.   Do you have any future sentence to serve after you complete the sentence for the judgment that you are

challenging?        ☐ Yes    ☑ No

(a) If so, give name and location of court that imposed the other sentence you will serve in the future:

_____

_____

(b) Give the date the other sentence was imposed: _____

(c) Give the length of the other sentence: _____

(d) Have you filed, or do you plan to file, any petition that challenges the judgment or sentence to be served in the

future?        ☑ Yes    ☑ No

18.   TIMELINESS OF PETITION: If your judgment of conviction became final over one year ago, you must explain

why the one-year statute of limitations as contained in 28 U.S.C. § 2244(d) does not bar your petition.*

See Attached  United States District Court for the District of

Maryland - "Order."

_____

_____

_____

_____

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JAMAAL K. ABEOKUTO #323-969           :

        Petitioner

                             :

v.                                    CIVIL ACTION NO. RDB-08-3203

                             :

WARDEN

        Respondent           :

## O R D E R

On July 20, 2009, the undersigned deemed timely an application for habeas corpus relief

filed by Jamaal K. Abeukuto. Respondent seeks reconsideration of that decision. Paper No. 17.

Petitioner has responded to the reconsideration request Paper No. 19, and Respondent has replied

thereto. Paper No. 20.

Respondent's arguments that the application is untimely are compelling, but need not be

addressed here. Petitioner on two occasions has asked that this case be dismissed without

prejudice so that he may complete state post-conviction review. Paper Nos. 14 and 19. The

Court notes that Petitioner filed a pro se petition for post-conviction relief in the Circuit Court for

Baltimore County on June 10, 2009. This filing may in fact have been sufficient to toll the one-

year federal limitations period. Thus, dismissal of the instant action without prejudice to refilling

upon completion of state post-conviction review is appropriate.[1]

Accordingly, it is this 25th day of <u>August</u> 2009, by the United States District Court for

the District of Maryland, hereby Ordered that:

1.      The above-captioned case IS DISMISSED WITHOUT PREJUDICE;

---

[1] The Court is without apparent authority to extend Petitioner additional time following the completion of post-conviction review in which to file a petition here. This dilemma appears to have resulted from Petitioner having waited until the last possible day within the federal limitations period to seek post-conviction relief in the Circuit Court.

2.    The Clerk SHALL CLOSE this case; and

3.    The Clerk SHALL MAIL a copy of this Order to Petitioner and to counsel of

record.

                                        /s/
                                        _____
                                        Richard D. Bennett
                                        United States District Judge

2

AO 241
(Rev. 01/15)

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

\* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2244(d) provides in

part that:

    (1)      A one-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody  pursuant to the judgment of a State court.  The limitation period shall run from the latest of -

           (A)      the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

           (B)      the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such state action;

           (C)      the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

           (D)      the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

AO 241
(Rev. 01/15)

(2)    The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

Therefore, petitioner asks that the Court grant the following relief: *The petitioner ask for the appropurate relief of a new trial or to grant petition in part on Criminal responsibity only*

or any other relief to which petitioner may be entitled.

_____
Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Petition for Writ of Habeas Corpus was placed in the prison mailing system on *MAY 27, 2021* (month, date, year).

Executed (signed) on *May 27, 2021* (date).

*Jamaal Abeokuto*
_____
Signature of Petitioner

If the person signing is not petitioner, state relationship to petitioner and explain why petitioner is not signing this petition.

_____
_____
_____
_____